## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company, ) | ) |
| Plaintiffs, ) | Case No. 1:17-cv-5845 |
| ) | |
| v. ) | **PLAINTIFF DEMANDS** |
| ) | **TRIAL BY JURY** |
| 21st Century Pharmacy Inc., ) | |
| Albert Alishayev, ) | |
| Iris Itskhakov a/k/a Istam Itskhakov, ) | |
| Peter Khaim a/k/a Peter Khaimov a/k/a Petr Khaimov, ) | |
| Tariel Begiyev, ) | |
| Express Billing & Collection Inc, ) | Hon. Margo K. Brodie |
| Anturio Marketing, Inc., ) | |
| Logic Consulting, Inc., ) | Magistrate Judge |
| P&K Marketing Services Inc, ) | Vera M. Scanlon |
| A&P Holding Group Corp, ) | |
| New Business Resources Group Inc, ) | |
| K&L Consultants Inc, ) | |
| New Business Funding Inc, ) | |
| TBM Solution Inc, ) | |
| TAR Group Inc, ) | |
| Personal Tech Inc, ) | |
| Timothy Morley, D.O., ) | |
| Azu A. Ajudua, M.D., ) | |
| Vincentiu Popa, M.D., and ) | |
| Jo-Ann Shakarjian, M.D., ) | |
| ) | |
| Defendants. ) | |

## <u>FIRST AMENDED COMPLAINT</u>

State Farm Mutual Automobile Insurance Company ("SFMA") and State Farm Fire and

Casualty Company ("SFF"), for their First Amended Complaint against 21st Century Pharmacy,

Inc. ("21st Century"), Albert Alishayev ("Alishayev"), Iris Itskhakov a/k/a Istam Itskhakov

("Itskhakov"), Peter Khaim (a/k/a Peter Khaimov a/k/a Petr Khaimov) ("Khaim"), Tariel

Begiyev ("Begiyev") (Alishayev, Itskhakov, Khaim, and Begiyev collectively the "Management

Group"), Express Billing & Collection Inc ("Express Billing"), Anturio Marketing, Inc. ("Anturio Marketing"), Logic Consulting, Inc. ("Logic Consulting"), New Business Resources Group Inc ("New Business Resources Group"), K&L Consultants Inc ("K&L Consultants"), P&K Marketing Services Inc ("P&K Marketing"), A&P Holding Group Corp ("A&P Holding"), New Business Funding Inc ("New Business Funding"), TBM Solution Inc ("TBM Solution"), TAR Group Inc ("TAR Group"), Personal Tech Inc ("Personal Tech") (Anturio Marketing, Logic Consulting, New Business Resources Group, K&L Consultants, P&K Marketing, A&P Holding, New Business Funding, TBM Solution, TAR Group, and Personal Tech collectively the "Shell Companies"), Timothy Morley, D.O. ("Morley"), Azu A. Ajudua, M.D. ("Ajudua"), Vincentiu Popa, M.D. ("Popa"), and Jo-Ann Shakarjian ("Shakarjian") (collectively "Defendants"), allege as follows:

## I.      NATURE OF THE ACTION

1.      This action seeks to recover money fraudulently and unjustly obtained from SFMA and SFF through the submission of bills and supporting documentation for topical compounded medications ("Compounded Products") provided to individuals who were involved in automobile accidents and eligible for benefits under SFMA or SFF insurance policies ("State Farm Insureds").

2.      The Compounded Products were provided to State Farm Insureds by 21st Century and purportedly prescribed for pain relief by Morley, Ajudua, Popa, Shakarjian, and other physicians (collectively the "Prescribing Doctors") in New York.

3.      The Management Group — consisting of Alishayev, Khaim, Itskhakov, and Begiyev — acted in concert to form 21st Century and the Shell Companies, to carry out and profit from the scheme by facilitating prescriptions and bills for medically unnecessary Compounded Products, and facilitate financial arrangements, which include the payment of

kickbacks, with (a) individuals in charge of locations at which patients are treated; (b) Prescribing Doctors; and (c) marketers who in turn have arrangements with individuals in charge of locations at which patients are treated and/or with Prescribing Doctors.

4.      The scheme involves 21st Century's preparation of Compounded Products, which consist of various drugs combined in a topical cream, and the prescription of those Compounded Products by the Prescribing Doctors to treat patients who have been in automobile accidents and who allegedly complain of musculoskeletal pain orneuropathies.

5.      Compounded Products are appropriate when the unique needs of anindividual patient cannot be met by medication approved by the U.S. Food and Drug Administration ("FDA").   21st Century's topical Compounded Products, however, are not legitimate compounds, are not tailored to the particular needs of any one patient, and should have been subject to FDA approval.  21st Century simply assembles a routine combination of ingredients in a cream form, provides these creams to a variety of patients and charges on average about $2,350 and up to as much as almost $9,000 for a 300 gram (or about 10 ounces) tube. *See* Ex. 1.

6.      21st Century's charges are supported by prescriptions and letters of medical necessity from the Prescribing Doctors.  The prescriptions and letters of medical necessity are largely form documents, many of which are created and supplied to the Prescribing Doctors for completion and signing by 21st Century, the Management Group, and marketers.   The prescriptions consist of predetermined lists of Compounded Products manufactured by 21st Century on which the Prescribing Doctors circle or mark the one they are prescribing for their patient.  The letters of medical necessity contain boilerplate language that attest to the purported necessity of the Compounded Products.  21st Century submits charges for these Compounded Products to SFMA and SFF, largely through its billing and collection company, Express Billing,

knowing that 21st Century is not entitled to be paid for the Compounded Products because they are not medically necessary and are not reimbursable.

7.     21st Century, Express Billing, the Management Group, the Shell Companies, and the Prescribing Doctors know the Compounded Products are not medically necessary or efficacious for the conditions for which they are prescribed because, among other things: (a) the Compounded Products include drugs that are not proven to have any therapeutic effect from topical application for the conditions; (b) there is no evidence that certain of the drugs in the Compounded Products can permeate the skin in sufficient quantities to achieve any therapeutic effect; (c) there is no legitimate basis for combining the drugs 21st Century uses in its Compounded Products nor is there evidence that the drugs they contain are compatible with each other; (d) there is no evidence that the drugs in the Compounded Products are stable; (e) there is no legitimate reason to provide patients with expensive Compounded Products (averaging about $2,350 and costing up to as much as almost $9,000 per 10 ounce tube) when there are many other proven effective alternatives that are commercially available at considerably lower cost; and (f) the Compounded Products, which were not FDA approved, were not prepared for the unique needs of any identified individual patient and thus were not legitimate Compounded Products exempt from FDA approval.

8.     The Prescribing Doctors provide prescriptions and letters of medical necessity for the Compounded Products not because the Compounded Products are medically necessary, but as a result of financial arrangements, which include the payment of kickbacks, between 21st Century, Express Billing, the Management Group, and/or the Shell Companies with (a) individuals in charge of locations at which patients are treated; (b) Prescribing Doctors; and (c)

marketers who in turn have arrangements with individuals in charge of locations at which patients are treated and/or with Prescribing Doctors.

9.     While 21st Century is owned on paper by Alishayev, at all times, the Management Group acted in concert to form, fund, and operate 21st Century.  21st Century's bills were submitted by and through Express Billing.

10.     The Management Group owned and/or controlled the Shell Companies, which served several purposes.  The Shell Companies entered into arrangements to obtain prescriptions. Payments were made by 21st Century and Express Billing to the Shell Companies in order to transfer fraudulently and unjustly obtained proceeds received by 21st Century to the Management Group while hiding the Management Group's responsibility for the conduct and/or the amount of proceeds they were receiving from the conduct.  In fact, while Khaim and Begiyev were both involved in and responsible for the activity of 21st Century, neither ever received a direct payment from 21st Century.

11.     Defendants consist of the following:

(a)     21st Century, a pharmacy that prepared and provided medically unnecessary Compounded Products to patients and submitted fraudulent bills and supporting documentation seeking reimbursement for them;

(b)     Express Billing, a purported billing company that, among other things, prepared and submitted fraudulent bills and supporting documentation for 21st Century Compounded Products;

(c)     Prescribing Doctors Morley, Ajudua, Popa, and Shakarjian, who provided prescriptions and letters of medical necessity for the Compounded Products knowing they were medically unnecessary and as a result of financial arrangements, which include the payment of kickbacks;

(d)     the Management Group — Alishayev, Itskhakov, Khaim, and Begiyev — who acted in concert to form, fund, and operate 21st Century and the Shell Companies; carry out and profit from the scheme by facilitating prescriptions and bills for medically unnecessary Compounded Products; and facilitate financial arrangements, which include the payment of kickbacks, with (a) individuals in charge of locations at which patients are

treated; (b) Prescribing Doctors; and (c) marketers who in turn have arrangements with individuals in charge of locations at which patients are treated and/or with Prescribing Doctors; and

(e)     the Shell Companies — Anturio Marketing, Logic Consulting, New Business Resources Group, K&L Consultants, P&K Marketing, A&P Holding, New Business Funding, TBM Solution, TAR Group, and Personal Tech — which theManagement Group owned and/or controlled and used to fund 21st Century, facilitate financial arrangements to obtain prescriptions for 21st Century Compounded Products, and transfer proceeds of 21st Century's activities to the Management Group.

12.     Defendants' scheme began at least as early as 2014 and has continued uninterrupted since that time.  As a result of Defendants' scheme, SFMA and SFF have incurred damages of more than $1.73 million.

## II.    JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961 et seq. ("RICO") because they arise under the laws of the United States of America.  Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the state-law claims because they are so related to the RICO claims as to form part of the same case or controversy.  Pursuant to 28 U.S.C. § 1332(a)(1), this Court also has jurisdiction over the state-law claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  Defendants are jointly and severally liable for the damages caused to SFMA and SFF.

14.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here.

## III.    PARTIES

### A.     Plaintiffs

15.     SFMA is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and it issues automobile insurance policies in New York.

16.     SFF is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and it issues automobile insurance policies in New York.

**B.      Defendants**

**1.      21st Century**

17.     21st Century is a New York corporation with its principal place of business in Corona, New York, and is therefore a citizen of New York.  21st Century was incorporated on or about December 19, 2012.  21st Century is owned on paper by Alishayev.  21st Century submitted or caused to be submitted to SFMA and SFF bills and supporting documentation for Compounded Products that were not medically necessary and not reimbursable.

**2.      Express Billing**

18.     Express Billing is a New York corporation with its principal place of business in Forest Hills, New York, and is therefore a citizen of New York.  Express Billing was incorporated on or about July 30, 2014.  Express Billing is owned on paper by Itskhakov. Express Billing prepared and submitted or caused to be submitted bills and supporting documentation to SFMA and SFF on 21st Century's behalf for Compounded Products that were not medically necessary and not reimbursable.

**3.      Prescribing Doctors**

19.     Morley resides in and is a citizen of Ohio.  Morley was licensed to practice medicine in New York on October 20, 2011.  On October 11, 2017, his license was suspended based on unsanitary practices and his failure to supervise employees in connection with administering injected substances to patients.    From at least April 23, 2014 through October 13, 2015, Morley prescribed Compounded Products to State Farm Insureds, and he knew that the Compounded Products were not medically necessary and not reimbursable.

20.     Shakarjian resides in and is a citizen of New Jersey.  Shakarjian is licensed to practice medicine in New York and New Jersey and practices medicine in New York.  From at least November 11, 2014 through March 15, 2016, Shakarjian prescribed Compounded Products to State Farm Insureds, and she knew that the Compounded Products were not medically necessary and not reimbursable.

21.     Ajudua resides in and is a citizen of New York.  Ajudua is licensed to and practices medicine in New York.  From at least April 8, 2014 through February 1, 2016, Ajudua prescribed Compounded Products to State Farm Insureds, and he knew that the Compounded Products were not medically necessary and not reimbursable.

22.     Popa resides in and is a citizen of New Jersey.  Popa is licensed to and practices medicine in New York and New Jersey.  From at least December 22, 2014 through April 5, 2016, Popa prescribed Compounded Products to State Farm Insureds, and he knew that the Compounded Products were not medically necessary and not reimbursable.

### 4.    The Management Group

23.     Alishayev resides in and is a citizen of New York.  Alishayev is the paper owner of 21st Century.  Alishayev is a registered nurse and is neither a physician nor a pharmacist.

24.     Itskhakov resides in and is a citizen of New York.  Itskhakov is the paper owner of Express Billing.  Itskhakov is neither a pharmacist nor a physician.

25.     Khaim resides in and is a citizen of New York.  Khaim is the paper owner of Anturio Marketing, A&P Holding, New Business Resources Group, K&L Consultants, P&K Marketing, and Logic Consulting.  Additionally, Khaim owns at least one other pharmacy, Sutter Pharmacy Inc. ("Sutter Pharmacy").  Sutter Pharmacy did business as RX For You Corp., and although there was a separate corporate entity known as RX For You Corp. owned on paper by

Vyacheslav Mushyakov, that purportedly separate corporate entity and Sutter Pharmacy were one and the same.  Khaim is neither a pharmacist nor a physician.

26.     Begiyev resides in and is a citizen of New York.  Begiyev is the paper owner of New Business Funding, TAR Group, and TBM Solution.  Additionally, Begiyev has owned at least three pharmacies:  A&P Pharmacy Corp., Cure Care Pharmacy, Inc. d/b/a Surf Avenue Pharmacy, and Green Leaf Pharmacy Inc. d/b/a Surf Avenue Pharmacy.  Begiyev is neither a pharmacist nor a physician.

### 5.     The Shell Companies

#### a.     Anturio Marketing

27.     Anturio Marketing is a New York corporation with its principal place of business in Rego Park, New York, and is therefore a citizen of New York.  Anturio Marketing was incorporated on or about March 15, 2011.  Anturio Marketing is owned on paper by Khaim.  Alishayev is the registered domain owner of Anturio Marketing's internet address.  Alishayev has testified that Anturio Marketing "used to do marketing for him."

28.     According to its website, Anturio Marketing "provides referral[] services for individual[s] who have been involved in a car collision."  Anturio Marketing refers auto accident victims to a "suitable medical team or physical therapists," and then refers them to "Legal Representation . . . to sort out the legalities," which "could involve damage to property/vehicle, insurance claims, personal injury and other issues" that it claims its "lawyers are surely capable of handling."

#### b.     Logic Consulting

29.     Logic Consulting is a New York corporation with its principal place of business in Middle Village, New York, and is therefore a citizen of New York.  Logic Consulting was incorporated on or about February 25, 2016.  Logic Consulting is owned on paper by Khaim.  A

bank account of Anturio Marketing identifies Logic Consulting as a d/b/a of Anturio Marketing, and checks payable to Logic Consulting were deposited into Anturio Marketing's bank account. Checks made payable to Logic Consulting almost all predate its incorporation.

### c.    New Business Resources Group

30.    New Business Resources Group is a New York corporation with itsprincipal place of business in New Hyde Park, New York, and is therefore a citizen of New York.  New Business Resources Group was incorporated on or about October 8, 2013.  New Business Resources Group is owned on paper by Khaim.

31.    New Business Resources Group was formally dissolved on February 28, 2018, but remains liable to SFMA and SFF pursuant to New York's Business Corporation Law § 1006.

### d.    K&L Consultants

32.    K&L Consultants is a New York corporation with its principal place of business in New Hyde Park, New York, and is therefore a citizen of New York.  K&L Consultants was incorporated on or about October 8, 2013.  K&L Consultants is owned on paper by Khaim.

33.    K&L Consultants was formally dissolved on February 28, 2018, but remains liable to SFMA and SFF pursuant to New York's Business Corporation Law § 1006.

### e.    P&K Marketing

34.    P&K Marketing is a New York corporation with its principal place of business in Forest Hills, New York, and is therefore a citizen of New York.  P&K Marketing was incorporated on or about November 19, 2014.  P&K Marketing is owned on paper by Khaim.

35.    P&K Marketing was formally dissolved on January 13, 2017, but remains liable to SFMA and SFF pursuant to New York's Business Corporation Law § 1006.

### f.    A&P Holding

36.    A&P Holding is a New York corporation with its principal place of business in Rego Park, New York, and is therefore a citizen of New York.  A&P Holding was incorporated on or about December 1, 2014.  A&P Holding is owned on paper by Khaim.  Khaim described A&P Holding in its Citibank Business Deposit Account Application as a "real estate management/construction/consulting" business.

### g.    New Business Funding

37.    New Business Funding is a New York corporation with its principal place of business in Flushing, New York, and is therefore a citizen of New York.  New Business Funding was incorporated on or about September 21, 2015.  New Business Funding is owned on paper by Begiyev.

38.    New Business Funding was formally dissolved on August 21, 2018, but remains liable to SFMA and SFF pursuant to New York's Business Corporation Law § 1006.

### h.    TBM Solution

39.    TBM Solution is a New York corporation with its principal place of business in New Hyde Park, New York, and is therefore a citizen of New York.  TBM Solution was incorporated on or about February 13, 2013.  TBM Solution is owned on paper by Begiyev.

40.    TBM Solution was formally dissolved on November 2, 2017, but remains liable to SFMA and SFF pursuant to New York's Business Corporation Law § 1006.

### i.    TAR Group

41.    TAR Group is a New York corporation with its principal place of business in Flushing, New York, and is therefore a citizen of New York.  TAR Group was incorporated on or about October 8, 2013.  TAR Group is owned on paper by Begiyev.

42.     TAR Group was formally dissolved on October 10, 2017, but remains liable to SFMA and SFF pursuant to New York's Business Corporation Law § 1006.

### j.      Personal Tech

43.     Personal Tech is a New York corporation with its principal place of business in Jamaica, New York, and is therefore a citizen of New York.  Personal Tech was incorporated on or about April 7, 2015.  Personal Tech is owned on paper by Alishayev's father, Mikho Alishayev.  When the company was set up, the accountant for Personal Tech corresponded with Alishayev and provided him with a pin number for Personal Tech so that Alishayev could "register *your* company with Federal so that we can pay *your* taxes online."  (Emphases added).

## IV.     ALLEGATIONS COMMON TO ALL COUNTS

### A.     New York's Relevant No-Fault, Pharmaceutical, And Licensure Laws

44.     Under New York's No-Fault Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101–06) and related regulations (11 N.Y.C.R.R. §§ 65-1–5) (collectively the "New York No-Fault Laws"), automobile insurers like SFMA and SFF provide mandatory benefits ("No-Fault Benefits") to their insureds.

45.     Mandatory No-Fault Benefits in New York include up to $50,000 per insured for expenses incurred for medically necessary goods and services following an automobile accident, including medically necessary prescription drugs.

46.     The pricing for Compounded Products is dictated by 12 N.Y.C.R.R. § 440.5(a) and (d).  First, a provider must determine the national drug code ("NDC") for each ingredient in the compound.  The NDC refers to a unique 10-digit code assigned to each drug that reflects the vendor of the drug, identifies the drug, and indicates the quantity of the drug packaged.  Each NDC number has a corresponding Average Wholesale Price ("AWP") in the Red Book

published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health, or any successor publisher, on the day a drug is dispensed.  *See* 12 N.Y.C.R.R. § 440.2(a).

47.     The pricing for Compounded Products is determined at the ingredient level.  *See* 12 N.Y.C.R.R. § 440.5(a), (d).  To calculate the price of an ingredient, a provider must subtract either 12% if the ingredient is a name brand or 20% if the ingredient is a generic from the AWP and multiply the result by the amount of the ingredient in the compound.  To calculate the price of a Compounded Product, the provider adds the cost of the ingredients together and adds a "dispensing fee" of either $4.00 if the drug is a name brand or $5.00 if the drug is generic.

48.     In addition, the NDC and AWP vary based on the quantity of the drug purchased and/or the supplier.  For example, suppliers may provide Diclofenac Na in three (3) different quantities.  Each quantity has its own unique NDC number, which corresponds to a unique AWP. A supplier may provide 25 grams of Diclofenac Na for $2.60 per gram, 100 grams for $2.20 per gram, and 500 grams for $1.84 per gram.  Charges must reflect the NDC number and AWP that correspond to the amount of the drug it ordered.  If, for example, a provider purchased 500 grams of Diclofenac Na from that supplier for $1.84 per gram but used the NDC and AWP that corresponded to the purchase of 25 grams of Diclofenac Na for $2.60 per gram, this would result in overcharging for the resulting Compounded Product.

49.     New York law generally requires that "[a]ll prescriptions written in [New York] [for pharmaceutical drugs] shall be issued on an official New York State prescription form provided by the" Department of Health.  10 N.Y.C.R.R. § 910.2(a).  The "[o]fficial New York State prescription forms shall be imprinted only with the primary address and other addresses listed on the registration of the facility or practitioner."  10 N.Y.C.R.R. § 910.4(a)(2).

50.     Under New York law, it is unlawful for a physician to directly or indirectly offer, give, solicit, receive, or agree to receive any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services.  *See* N.Y. Educ. Law § 6530(18).

51.     Under New York Public Health Law § 238-a, a practitioner authorized to order pharmacy services may not make a referral for such services to a healthcare provider authorized to provide such services, including to compounding pharmacies like 21st Century, where such practitioner has a financial relationship with such healthcare provider.  *See also* 10 N.Y.C.R.R. § 34-1.3; N.Y. Pub. Health Law § 238(6) ("'Health care provider' shall mean a practitioner in an individual practice, group practice, partnership, professional corporation or other authorized form of association, . . . and any other purveyor of health or health related items or services including but not limited to a clinical laboratory, a physiological laboratory, a pharmacy, . . . a purveyor of health or health related supplies, appliances or equipment . . . .").  A financial relationship includes a compensation arrangement and includes an arrangement with a healthcare provider that is in excess of fair market value or which provides compensation that varies directly or indirectly based on the volume or value of any referrals or business between the parties.  *See* N.Y. Pub. Health Law §§ 238(3) & 238-d.

52.     Under New York law, it is unlawful for a physician to make a referral to certain health-care providers where the physician has a compensation arrangement with the health-care provider that either exceeds fair market value or that provides compensation that varies directly or indirectly on the value of referrals, without disclosing the relationship to the patient.  *See* N.Y. Pub. Health Law § 238-d(1)(b).  Any disclosure must not only reveal to the patient the existence of the financial relationship, but must also inform the patient of her right to use a "specifically

14

identified alternative" health-care provider. *See* N.Y. Pub. Health Law § 238-d(2). Any violation of Public Health Law § 238-d by physicians also constitutes professional misconduct under N.Y. Educ. Law § 6530(48).

53. Under New York law, it is unlawful for a physician or chiropractor to exercise undue influence on a patient, including the promotion or the sale of goods or services in such a manner as to exploit the patient for the financial gain of the physician or of a third party, like 21st Century. *See* N.Y. Educ. Law § 6530(17).

54. Consistent with the above-described provisions of New York law prohibiting unlawful referrals, Opinion 8.06 of the American Medical Association Code of Medical Ethics (the "AMA Ethics Code") provides that: (a) "Physicians should not urge patients to fill prescriptions from an establishment which has entered into a business or other preferential arrangement with the physician . . . ."; (b) "In all instances, physicians should respect the patient's freedom of choice in selecting who will fill their prescriptions"; (c) patients "have the right to have a prescription filled wherever they wish"; (d) "[P]hysicians should not be influenced in the prescribing of drugs . . . or other treatment by a direct or indirect financial interest in a firm or other supplier, regardless of whether the firm is a manufacturer, distributor, wholesaler, or repackager of the products involved"; and (e) "Physicians should prescribe drugs . . . based solely upon medical considerations and patient need and reasonable expectations of the effectiveness of the drug . . . ."

55. Consistent with the above-described provisions of New York law prohibiting unlawful financial arrangements to induce referrals and steering patients to a particular provider for health care goods and services, Opinion 8.03 of the AMA's Ethics Code provides that: "Under no circumstances may physicians place their own financial interests above the welfare of

their patients . . . . For a physician to unnecessarily . . . prescribe a . . . drug . . . for the physician's financial benefit is unethical."

56.     Under New York law, a provider of healthcare goods or services is not entitled to No-Fault Benefits if the provider fails to meet any applicable New York state or local licensing requirement necessary to perform such service in New York.   *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).  As described below in paragraphs 123–156, 21st Century, Express Billing, the Management Group, and/or the Shell Companies had financial arrangements, which include the payment of kickbacks, with (a) individuals in charge of locations at which patients are treated; (b) Prescribing Doctors; and (c) marketers who in turn have arrangements with individuals in charge of locations at which patients are treated and/or with Prescribing Doctors, and those arrangements violate N.Y. Education Law § 6530(18) or N.Y. Public Health Law §§ 238-a and 238-d.  21st Century is therefore ineligible to collect No-Fault Benefits on any claims that were the result of such arrangements.

57.     Pursuant to New York law, professional corporations are not eligible to bill for or collect No-Fault Benefits if they are fraudulently incorporated.  In New York, only a licensed physician may practice medicine, own, and control a professional service corporation authorized to practice medicine, employ and supervise other physicians, and, absent statutory exceptions, derive economic benefit from physician services.

58.     The New York Legislature has established a comprehensive statutory framework, including the Business Corporation, Education, and Public Health Laws, to ensure that professional health-care services are rendered only by individuals who are duly licensed to practice those professions and that such individuals are employed only by entities that are themselves lawfully licensed or otherwise legally authorized to provide such services.  This legal

16

framework bars individuals who are not subject to state professional licensing requirements and ongoing regulatory oversight from controlling, exercising undue influence over, or deriving economic benefit from the practice of a profession.

59.    Recognizing the fundamental importance of these laws in safeguarding the public health, safety, and welfare, the New York Legislature has made it a felony offense for anyone to deliberately circumvent these laws, as well as an act of professional misconduct for any licensed individual or professional service corporation to do so.  *See* N.Y. Bus. Corp. Law §§ 1203(b), 1503(b), 1507, 1508, 1511; N.Y. Educ. Law §§ 6507(4)(c), 6512, 6530(1) & (21); 8 N.Y.C.R.R. § 29.1(b)(6); Penal Law Article 175; Limited Liability Company Law § 1201 et seq.

60.    Consistent with the public policies underlying New York's ban on the corporate practice of medicine, New York Law also prohibits professional corporations that are secretly owned and controlled by laypersons from receiving No-Fault Benefits for professional health services.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

**B.    The Formation Of 21st Century And The Roles Of Alishayev, Khaim, And Begiyev In Forming, Funding, And Operating 21st Century**

61.    21st Century was incorporated on December 19, 2012, and according to its corporate filings and tax returns and testimony of Alishayev, it is owned only by Alishayev. Alishayev has never been a physician or a pharmacist.  In 2011, just one year before 21st Century was formed, Alishayev became a licensed registered nurse.

62.    Khaim was very involved in the formation, funding, operation, and success of 21st Century.  Alishayev has admitted that "Peter Khaim played a significant role in the creation of 21st Century Pharmacy."  According to Alishayev, "Khaim, having invaluable knowledge of the industry gained through ownership of his own compounding pharmacy . . . , served as a key consultant to Alishayev.  He advised Alishayev on a broad range of matters on a daily basis,

17

relating to all aspects of the business until Alishayev gained enough knowledge to understand the intricacies of owning and managing a pharmacy."  Indeed, emails produced in this case prove that Khaim negotiated agreements with third parties on 21st Century's behalf, dealt with lawyers and service providers, monitored billings, reviewed invoices, and coordinated the renovation of space including obtaining work and building permits.

63.     Khaim's authority was such that he arranged for several of his family members to become employees of 21st Century.  In that regard, Oksana Poltilova ("Poltilova"), who on information and belief is Khaim's wife, has identified herself as 21st Century's "Supervisor of Billing/Collections Department," was a former 21st Century "manager," and sent emails from the sales@21centurypharmacy.com email address.  The Khaim Family Irrevocable Trust reflects that Poltilova is the mother of Khaim's children, and they have purchased residential property together.  Boris Khaimov, Khaim's father, and Irina Khaimova, another relative, have been employed by 21st Century as pharmacy technicians, and Gabriel Khaimov, yet another relative, is a former 21st Century cashier.

64.     Furthermore, Khaim provided substantial funding to 21st Century shortly after it was formed.  In fact, Alishayev has admitted that "Khaim loaned Defendants [*i.e.*, 21st Century and Alishayev] a substantial amount of money to fund the establishment of the pharmacy." Specifically, on or about January 2, 2013, which was two weeks after 21st Century was formed, one of the Shell Companies owned by Khaim, Anturio Marketing, entered into an agreement to loan 21st Century up to $100,000 .  By November 30, 2013, Anturio Marketing had purportedly loaned to, and was owed by, 21st Century $212,282.  One year after that, as of November 30, 2014, Anturio Marketing had allegedly loaned an additional $272,150 to 21st Century. Alishayev, Khaim, 21st Century, and Anturio Marketing have not produced any agreement,

18

communication, or other document, other than the above-described January 2, 2013 loan agreement for up to $100,000, regarding the purported loans from Anturio Marketing to 21st Century totaling more than $484,000 in 2013 and 2014.  Moreover, as of November 30, 2017, 21st Century purportedly had repaid to Anturio Marketing only $162,264 of these loans.

65.     Additionally, in April 2016, a compounding pharmacy owned by Khaim, Sutter Pharmacy ████████████████████████████████████  This amount is not identified as a "loan" on the list of loans produced by 21st Century in this case, and Alishayev, Khaim, 21st Century, and Sutter Pharmacy have not produced any agreement, communication, or other document regarding this payment to 21st Century.

66.     Khaim's brother, Arkadiy Khaimov, also provided funding to 21stCentury. Specifically, on or about June 20, 2013, one of the companies that he owned, AAA Wholesale, Inc. ("AAA Wholesale"), entered into an agreement to loan 21st Century up to $40,000.  By November 30, 2013, AAA Wholesale purportedly had loaned to, and was owed by, 21st Century $39,300.  According to 21st Century's documentation of loans and repayments, the only repayment of this loan was $14,833, which was paid by 21st Century to AAA Wholesale sometime between November 30, 2016 and November 30, 2017.

67.     Like Khaim, Begiyev also provided substantial funding to 21st Century. Specifically, sometime between November 30, 2014 and November 30, 2015, a Shell Company owned by Begiyev, New Business Funding, had purportedly loaned to and was owed by 21st Century $160,000.  Sometime between November 30, 2015 and November 30, 2016, the same Shell Company, New Business Funding, allegedly loaned an additional $392,000 to 21st Century.  Yet, Alishayev, Begiyev, 21st Century, and New Business Funding have not produced

any agreement or communication regarding the purported loans from New Business Funding to 21st Century totaling $552,000 between 2014 and 2016.[1]

68.     Although New Business Funding purportedly loaned $552,000 to 21st Century between 2014 and 2016, 21st Century allegedly repaid New Business Funding almost three times that amount, slightly more than $1,550,000, between 2015 and 2017.

**C.     Itskhakov, Along With Others, Managed The Day-To Day OperationsOf 21st Century And Express Billing Was Formed To Perform The Billing And Collection For 21st Century**

69.     Itskhakov, along with others, was involved in managing the operations of 21st Century.   Express Billing, which she owned on paper, was formed to handle billing and collections for 21st Century.

70.     Itskhakov has been identified as the "Administrator" for 21st Century and as 21st Century's "Store Manager."   She managed its day-to-day activities, supervised employees and other contractors to perform services for 21st Century, handled employee taxes and unemployment benefits, monitored employee sick days, reviewed expense reports, processed expenses, and oversaw the website.   Itskhakov had significant involvement in marketing the Compounded Products, including coordinating with marketers, patients, and Prescribing Doctors to ensure that marketers obtained prescriptions.

71.     On or about July 30, 2014, Itskhakov formed Express Billing to perform all the billing and collections for 21st Century.   From that point forward, all of the fraudulent bills at issue from 21st Century were submitted through and collected by Express Billing.

---

[1] Tariel Begiyev also provided additional funds indirectly.   Between January 30, 2017 and March 13, 2017, New Business Funding, owned by Begiyev, wrote checks to General Supply of NY, Inc. ("General Supply"), owned by Alishayev, totaling more than $350,000.

72.     According to its website, Express Billing offers billing, collection, litigation, and arbitration services to healthcare providers, including assisting providers in navigating independent medical examinations, independent peer reviews, and examinations under oath. Express Billing purports to "have devised a no fault collection system that spans from the time the documentation is put in place, the billing is filed with the insurance company and all the way to the reimbursement of the medical services rendered."     In fact, Express Billing is indistinguishable from 21st Century and functioned as an extension of it.   At a July 13, 2018 hearing in the matter *Allstate Insurance. Co., et al., v. 21st Century Pharmacy, Inc., et al.*, 1:17-cv-03731-WFK-SMG (E.D.N.Y.), Express Billing represented there is "not a clear line" between 21st Century and Express Billing.   Alishayev has testified that until Express Billing was formed, 21st Century outsourced its billing to a company called Tangent-EHR, LLC.   According to Alishayev, his wife (*i.e.*, Itskhakov) suggested they bring 21st Century's billing in-house, and he told his wife "[w]hy don't you . . . do this . . . . We are losing money here."   As a result, they started "doing [billing] in-house [*i.e.*, through Express Billing]," initially in the basement of 21st Century and then Alishayev "gave [Itskhakov/Express Billing] some of [21st Century's] employees . . . ."

73.     21st Century and Express Billing share employees, and employees of Express Billing use 21st Century email addresses almost exclusively.   Itskhakov uses a gmail account and 21st Century email accounts to conduct business on behalf of both 21st Century and Express Billing.   The registered domain owner of Express Billing's website is Alishayev.

74.     In less than four years, between July 25, 2014 to March 8, 2018, 21st Century has paid Express Billing over $2.2 million.

### D.     Compounded Products And Topical Medications

75.     Compounding is a practice in which a licensed pharmacist or physician combines, mixes, or alters individual ingredients into a usable drug product (*i.e.*, Compounded Product) to create a medication tailored to the needs of an individual patient.  Compounded Products may be appropriate when the needs of a patient cannot be met by an FDA-approved medication.  For example, a patient who is allergic to a dye in an FDA-approved medication might be provided with a form of the drug without the dye, or an elderly patient or a child who cannot swallow a tablet or capsule might obtain a medicine in a liquid form that is not otherwise available.

76.     Compounded drugs generally are not FDA approved, though they may include FDA approved drugs, and generally are exempt from FDA approval.  Under federal law, compounding is permitted by a pharmacy like 21st Century if the drug is compounded for an identified individual patient based on the receipt of a valid prescription or a notation approved by the prescribing practitioner on the prescription order that a compounded product is necessary for the identified patient.  *See* 21 U.S.C. § 353a.

77.     When Congress adopted this provision of the Federal Food, Drug and Cosmetic Act governing compounding, 21 U.S.C. § 353a, its express intent was to "ensure continued availability of compounded drug products as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing [of drugs that would otherwise require FDA approval] under the guise of compounding."  H.R. Rep. No. 105-399, at 94 (1997) (Conf. Rep.).  As Congress stated at the time, the "exemptions in [the section] are limited to compounding for an individual patient based on the medical need of such patient for the particular drug compounded.  To qualify for the exemptions, the pharmacist or physician must be able to cite to a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate.  Medical need would not

include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons."  S. Rep. No. 105-43, at 67–68 (1997).

E.    **21st Century's Compounded Products Are Not Medically Necessary For The Conditions For Which They Are Prescribed**

78.    21st Century purports to provide to State Farm Insureds Compounded Products in topical creams to treat musculoskeletal pain and neuropathies.  *See* Exs. 2–4.  Defendants know that 21st Century's Compounded Products are not medically necessary for a number of reasons.

1.    **There Is No Evidence That Certain Of The Drugs In 21st Century's Compounded Products Are Effective For the Conditions For Which They Are Prescribed**

79.    First, there is no indication that some drugs in 21st Century'sCompounded Products can provide therapeutic benefits in topical form to patients who suffer from musculoskeletal pain and neuropathy as a result of automobile accidents, the conditions for which the Compounded Products are purportedly prescribed.

80.    Among the drugs in 21st Century's Compounded Products for which there is no evidence in any peer-reviewed literature that they have therapeutic effect in topical form on patients for musculoskeletal pain or neuropathy are: Ketorolac, Mometasone, Verapamil HCl, Tranilast, and Levocetirizin.  *See* Ex. 1.  There are no published, peer-reviewed, controlled studies involving patients who suffer from musculoskeletal pain or neuropathy in which creams containing any of these substances were topically administered to normal living skin tissue and a therapeutic effect was achieved.

2.    **There Is No Evidence That Certain Of The Drugs In 21st Century's Compounded Products Are Permeable**

81.    Second, it is highly questionable whether some of the drugs in 21st Century's Compounded Products can penetrate the skin in sufficient quantities to achieve any therapeutic effect.

82.     Any drug intended to alleviate pain ultimately should reach nerve or tissue receptors that produce or transmit such pain.  Orally administered drugs are often prescribed for musculoskeletal pain and neuropathies, and they typically reach the relevant receptors by passing from the gastrointestinal system into the bloodstream and traveling through the bloodstream to the relevant site of action or receptors to reduce or alleviate pain.  Physicians and other healthcare providers prescribe topical drugs to avoid gastrointestinal distress or to supply higher peripheral drug concentration.  Nevertheless, topical drugs must still reach the relevant peripheral receptors to have an effect.  The relevant peripheral receptors for musculoskeletal pain and neuropathies are in the fascia (fibrous tissue), muscles, tendons, ligaments, and associated nerves.  For topically applied drugs to reach these relevant peripheral receptors, they must pass through the barrier layer of the skin (stratum corneum) and into the epidermis, and then typically into the dermis where drugs would then pass into the bloodstream to be distributed to the active receptor sites in the fascia, muscles, tendons, ligaments, and associated nerves.

83.     21st Century's Compounded Products, however, include Baclofen and Gabapentin which are known to have low permeability, and Lidocaine and Bupivacaine which are only successful at permeating and treating the outer barrier layer of the skin.  It has also been shown that Baclofen and Cyclobenzaprine do not act locally and must be absorbed into the body and reach the central nervous system to be effective.  Given the known permeability limitations of these drugs, it is highly questionable whether these substances in 21st Century's Compounded Products can penetrate the skin in sufficient quantities to have any effect.

**3.     There Is No Evidence That The Combinations of Drugs In 21st Century's Compounded Products Are Effective In Treating Musculoskeletal Pain Or Neuropathy Or Are Compatible**

84.     Even if there were support for the efficacy or permeability of some ingredients used by 21st Century, there would be no legitimate basis for the combination of drugs 21st

24

Century includes in each of its Compounded Products as there is no evidence that such combinations are effective in treating the conditions for which they are prescribed or that the drugs included are compatible with each other.

85.     21st Century creates and provides to State Farm Insureds Compounded Products that include as many as nine different purportedly active ingredients and charges on average about $2,350 up to as much as almost $9,000 for a 300 gram (or 10 ounce) tube.  21st Century's combination of drugs in its Compounded Products makes no sense clinically and serves only to increase the amount it can charge.

86.     Alishayev has admitted that 21st Century performs no independent research on its Compounded Products or conducts any testing or analysis on its Compounded Products.  Rather, internal 21st Century communications and communications between 21st Century employees and Medisca, Inc. ("Medisca") — a Canadian pharmaceutical supplier and the primary manufacturer and distributor of the ingredients of 21st Century's Compounded Products — reflect that 21st Century relies on Medisca to approve the formulas 21st Century uses for its Compounded Products.

87.     First, there are no published, peer-reviewed studies in which the particular combinations of active ingredients in 21st Century's Compounded Products have achieved a therapeutic effect for patients who suffer from musculoskeletal pain or neuropathy.  Thus, there is no support for the efficacy of 21st Century's Compounded Products.

88.     Second, there is no benefit from combining the active ingredients that make up 21st Century's Compounded Products.  There is no evidence in any peer-reviewed literature that the efficacy of 21st Century's Compounded Products is enhanced by adding the multiple drugs contained in these creams.  Furthermore, some ingredients in 21st Century's Compounded

Products have the same mechanism of action — *i.e.*, the specific biochemical interaction through which a drug produces its pharmacological effect.  There is no documented benefit to adding drugs to a Compounded Product that have the same mechanism of action, even if one of those drugs may, on its own, have a positive effect.  Indeed, even if any of the drugs had a positive effect, it would be impossible to know which drug, or combination of drugs, was responsible for the result.  Moreover, as alleged above, certain of 21st Century's Compounded Products contain drugs with no documented therapeutic benefit in topical form for the conditions for which they are prescribed.  There is no legitimate reason to include drugs in a Compounded Product that have no documented therapeutic benefit even if one or more of the drugs contained in the Compounded Product do have a documented therapeutic benefit.

89.     Third, there is no basis to conclude that the active ingredients contained in 21st Century's Compounded Products are chemically and physically compatible with each other.  The absence of any published, peer-reviewed studies involving the particular combinations provided by 21st Century means that there are no studies addressing whether the substances are compatible chemically or physically.

90.     Moreover, it cannot be known whether, as a result of the combination of drugs that make up each of 21st Century's Compounded Products, the ability of certain drugs to penetrate the skin or provide a pharmacological effect is hindered.  Some of the drugs included in 21st Century's Compounded Products are weak acids,[2] while others are weak bases.[3]  When weak acids and weak bases are combined in the base cream, some portions of each drug may

---

[2] Weak acids in the Compounded Products include Diclofenac Na, Baclofen, Ketorolac, Flurbiprofen, Ketoprofen, and Tranilast.

[3] Weak bases in the Compounded Products include Cyclobenzaprine HCl, Tetracaine HCl, Lidocaine, Clonidine HCl, Tramadol HCl, Bupivacaine HCl, Verapamil HCl, Mometasone, Levocetirizin, Gabapentin, Amantadine HCl, Amitriptyline HCl, Ketamine HCl, Meloxicam, Naproxen, Orphenadrine citrate, Piroxicam, Sumatriptan succinate, and Doxepin HCl.

dissolve.  These dissolved drug molecules can be charged, either positively or negatively, depending on certain qualities of the cream and the drugs.  These oppositely charged drugs can lead to, among other things, two possible interactions that can hinder the effect of a Compounded Product.  First, weak acids can be attracted to weak bases, forming large organic complexes with unknown properties.  At least some of these organic complexes may no longer be able to penetrate the outer barrier of the skin.  Second, the charged weak acids and weak bases can interact with each other in a way that results in drug precipitation — when the drug is no longer dissolved and crystallizes which causes them to become gritty and unable to provide any pharmacological benefit.  Indeed, based on the known pH characteristics of the transdermal base cream used by 21st Century, weak bases and weak acids contained in the Compounded Products would become charged,[4] and it is highly likely that either large organic complexes incapable of penetrating the outer barrier of the skin would form or drug precipitation would occur rendering the substances unavailable to benefit any patient.  Absent sufficient evidence that the combinations in 21st Century's Compounded Products do not create large organic complexes incapable of penetrating the skin or resulting in drug precipitation, it is simply not logical to combine these drugs in a topical cream.

91.    Additionally, 21st Century's Compounded Products involve the combining of several active ingredients in a transdermal base cream.  Theoretically, the base cream used in a topical compound should allow the active ingredients to be formulated together and enhance the delivery of the active ingredients into the bloodstream and then to the active receptor sites, or at least the base cream should not inhibit the delivery of the active ingredients.

---

[4] The reported pH of the cream used by 21st Century, Medisca Versapro pain base, is between 4.25 and 5.5.  At those levels, some drugs will become positively charged, while others will become negatively charged.

92.     21st Century's Compounded Products use a transdermal base called Versapro manufactured by Medisca.  Yet, 21st Century does not know what effect Versapro has on the compatibility, permeability, and efficacy of its Compounded Products.  Indeed, Alishayev has said that he does not "think it matters what base you use."

93.     Medisca describes itself as a "trusted partner in compounding," whose "mission is to provide the compounding industry with the highest quality Active Pharmaceutical Ingredients (APIs), including . . . bases."

94.     While Medisca reveals the ingredients in its Versapro pain base, it does not disclose the specific strength or relative quantity of each ingredient, thereby making it impossible to know whether the base cream is compatible with any of the active drugs that could be included in a compound.  There are no peer-reviewed studies regarding the Medisca Versapro pain base indicating whether it is an effective delivery vehicle for transdermal drug applications, or if it is compatible with any of the drugs that 21st Century purports to include in its Compounded Products.

95.     Moreover, the ingredient list and certificate of analysis in Medisca's Versapro pain base identify many different inactive ingredients.  Many of these ingredients may interact with or be incompatible with each other or with the active ingredients included in 21st Century's Compounded Products.  Some of the ingredients in the Versapro pain base are weak acids and some are weak bases, increasing the possibility that the base will lead to the formation of large organic complexes of unknown properties hindering the ability of active drugs to penetrate the skin.

96.     21st Century's claims to SFMA and SFF list each drug and base included in its Compounded Product and calculate charges for each separately.  As there is no medical benefit

from the combination of drugs in 21st Century's Compounded Products, the drugs in 21st Century's Compounded Products serve to increase the charges for 21st Century's medically unnecessary Compounded Products without any known or proven benefit.

**4.    There Is No Evidence That Drugs In 21st Century's Compounded Products Or The Compounded Products Themselves Are Stable**

97.    21st Century's Compounded Products are also potentially unstable.

98.    Pharmaceutical stability is the extent to which a medicine retains its physical and chemical properties and characteristics over time, and it is significant because a medicine should maintain the same properties and characteristics at the time it is used by the patient as it did when it was prepared.   Analysis of stability includes testing of products, consideration of peer-reviewed literature on the interactions among the particular drugs at issue, the physical and chemical properties of the individual drugs, the containers in which the products are packaged, likely storage conditions, and expected length of time over which the product will be used.

99.    There are no published, peer-reviewed studies addressing whether the substances in 21st Century's Compounded Products in combination, or with the Versapro pain base, are stable.   Alishayev has admitted that 21st Century does not conduct any testing or analysis to determine if its Compounded Products are stable, testifying that he "ha[s] no idea" whether the Compounded Products are stable.   Absent any indication of whether 21st Century's Compounded Products are stable or for how long they might remain stable, it is impossible to know whether over time they retain the properties and characteristics they held when prepared or whether they physically and chemically degrade rendering them ineffective, unstable, or potentially even harmful.

100.    Moreover, 21st Century's Compounded Products include ingredients that have known stability issues.   Baclofen is known to have very low solubility and may precipitate out

29

easily when added in higher concentrations, as it would be when mixed with a substance like the Medisca Versapro pain base cream — a physical alteration in which it goes from a molecular to a crystalline state, becomes gritty, and ceases to be available to provide any pharmacological benefit.  Ketoprofen, Cyclobenzaprine, and Gabapentin are each prone to become chemically unstable when exposed to light and moisture or oxidation, raising the risk that their chemical composition in the 21st Century Compounded Products would alter or degrade.  At a minimum, given the inclusion of these ingredients, it would be incumbent on any legitimate pharmacist to address such issues by researching or testing the stability of their product to determine if the product was stable, and, if necessary or possible, include ingredients to counteract potential instability.  There is no indication that 21st Century has done anything to consider, let alone address, the stability of its Compounded Products.

> **5.     There Is No Basis To Believe That 21st Century's Compounded Products Could Be Medically Necessary Given The Lack Of Evidence Supporting Their Benefit And The Availability Of Many Other Far Less Expensive, FDA Approved, And Proven Alternatives**

101.    Additionally, 21st Century's Compounded Products are unnecessary because there is no reason to provide an expensive Compounded Product whose efficacy is undocumented and unsupported when there are other widely accepted and effective alternatives with well-documented therapeutic benefits at considerably lower cost.  Most of the drugs contained in 21st Century's Compounded Products are available (a) in oral formulations; (b) commercially in different topical formulations; or (c) from similar and related classes of drugs. Some of these alternatives are widely used among practitioners treating these conditions and are FDA approved.

102.    Multiple appropriate treatment options exist for common musculoskeletal pains after a motor vehicle accident, including (a) oral non-steroidal anti-inflammatory drugs

(NSAIDS) such as the generic Naproxen Sodium 440 mg twice daily for $4.80 per month or nabumetone (Relafen) 500 mg twice daily for $35.05 per month; (b) oral NSAIDS that are known to reduce undesirable gastrointestinal side effects such as celecoxib (Celebrex) 100 mg twice daily for $60.35 per month or meloxicam (Mobic) 15 mg once daily for $146.25 per month; (c) oral medications to address pain through muscle relaxation such as baclofen (Lioresal) 20 mg three times daily for $96.29 per month, or cyclobenzaprine (Flexeril) 5 mg three times daily for $45.85 per month, which is FDA approved for the treatment of "muscle spasm associated with acute, painful musculoskeletal conditions"; (d) mood stabilization drugs that improve pain such as duloxetine (Cymbalta) 60 mg per day for $57.60 per month, which is FDA approved to treat chronic musculoskeletal pain; (e) oral nerve membrane-stabilizing medications such as gabapentin (Neurontin) up to 900 mg per day for $10.99 per month; (f) non-compounded topical prescription medications, including topical NSAIDS such as diclofenac gel (Voltaren) for $155.76 per month, and topical anesthetics such as lidocaine available as an over the counter topical gel for about $40 for a 60 gram tube; and (g) non-compounded over-the-counter topical medications used to treat pain including capsaicin (0.025 to 0.075% concentration, available in a topical patch, cream or gel) that can be applied up to three times daily for $49.75 per month, and topical anesthetics such as benzocaine (20% concentration, available in a topical spray, cream or gel) that can be applied up to four times daily for $138.50 per month.

### 6.   21st Century's Compounded Products Were Not Tailored To The Unique Needs Of Any Patient

103.   Compounded Products must be formulated for individual patients based upon the receipt of a valid prescription for an identified individual patient or a notation on a prescription that a compounded product is necessary for the identified patient. *See* 21 U.S.C. § 353a.  In fact,

the Compounded Products provided by 21st Century were not tailored to any individual patient or necessary to accommodate unique patient needs.

104.    Rather, as reflected in Exhibit 1, a large number of patients received a relatively small number of formulations.  Many patients were provided with identical Compounded Products, and the majority of patients were provided with a small variety of Compounded Products.  That so many patients were provided with similar formulations demonstrates that 21st Century's Compounded Products were not prescribed to address the unique needs of any individual patient.

105.    The Prescribing Doctors were responsible for the vast majority of prescriptions for 21st Century's Compounded Products in New York.  SFMA and SFF are aware of fewer than approximately 10 physicians that actually wrote the majority of prescriptions for 21st Century Compounded Products in New York.  That so few doctors prescribed such a high proportion of 21st Century's Compounded Products and that the patterns in the prescriptions and documentation of the Prescribing Doctors are so consistent and not credible further establishes that 21st Century's Compounded Products were not created or prescribed for the individual needs of a particular patient and were not medically necessary.

106.    21st Century's Compounded Products were not compounded for individual patients.  Thus, they required FDA approval as new drugs.  *See* 21 U.S.C. § 355; 21 U.S.C. 353a(a).  But 21st Century's Compounded Products are not approved by the FDA and are not legitimate compounded drugs exempt from FDA approval.  By manufacturing and distributing its mass produced drugs under the guise of purported compounds exempt from FDA approval, 21st Century deliberately sought to avoid the FDA approval regime intended to protect the health and safety of patients and the public.

F.    **21st Century And The Management Group Created Form Prescriptions For 21st Century's Compounded Products And Provided Them To And Collected Them From The Prescribing Doctors**

107.    21st Century and the Management Group created form prescriptions and arranged to provide them to and collect them from Prescribing Doctors in order to ensure that Compounded Products would be prescribed, Prescribing Doctors would order one of the limited mass produced formulations of 21st Century Compounded Products, and patients would get those Compounded Products from 21st Century rather than from any other source.

108.    Alishayev has testified that the Prescribing Doctors prescribe 21st Century's Compounded Products using forms directly provided by 21st Century that contain a list of preprinted Compounded Product formulations.  Emails confirm the role of the Management Group in developing prescription forms for 21st Century Compounded Products.  On November 11, 2013, a printing and design company forwarded to Khaim two draft 21st Century "Compounding Prescription Form[s]," which Khaim in turn forwarded to the email address general@21centurypharmacy.com, an address Alishayev and Itskhakov frequently used to conduct 21st Century business.  The Management Group continued to refine the prescription forms over time, as reflected in a later email dated June 11, 2015 and titled "Script pad ideas," which shows marketer Anthony DiPietro sending to Alishayev template prescription forms for Compounded Products and stating, "Albert, Take a look at the attachments. . . . Let me know what you think after you review these."  Later, on August, 7, 2015, DiPietro forwarded to Alishayev final versions of revised 21st Century Compounded Product prescription forms.

109.    Those prescriptions, rather than reflecting an individualized formulation to accommodate a "unique" patient, simply listed a limited number of predetermined Compounded Products the physician could check or circle.  *See* Exs. 2–4.  The forms even identified the common conditions for which a compound was appropriate.  *Id.*  For example, forms designated

33

certain Compounded Products as "General Pain Lotions," appropriate for musculoskeletal pain, tendinitis, strictures, arthritis, and scar therapy, while other Compounded Products were considered appropriate for "Neuropathic and Other Conditions," including "Neuralgia, Post Herpetic Neuralgia, Shingles, Diabetic Chemo Induced." *See id.*

110.    Many of the prescriptions written by the Prescribing Doctors for 21st Century's Compounded Products were written on one of three prescription forms.  None of those three forms had the primary address of the Prescribing Doctor who prescribed the Compounded Product or his or her facility.  Rather, the only identifying information on the forms, and prominently printed at the top of each form, was identifying information for 21st Century.  All three forms included the preprinted email address of 21st Century — general@21centurypharmacy.com — and the fax number for 21st Century.  *See id.*  One of the forms provides 21st Century's phone number, address, and has the heading "21st CENTURY PHARMACY."  *See* Ex. 4.  On the prescription forms, there is a box designated "Prescriber Authorization," which provides blanks to write in, among other things, the physician's name and contact information, *see* Exs. 2–4, and on two of the forms there is a directive for the physician to indicate whether the pharmacy should "[s]end refills automatically every 30 days."  *See* Exs. 3–4.

111.    While there were three commonly used forms, they differed essentially only in format as the compounded formulations from which physicians could choose on each of the forms were nearly identical.  *Compare* Ex. 2 *with* Exs. 3 & 4.  Some forms even include two pre-printed quantities from which the prescriber could select either "300 ML (4 weeks)" or "150 ML (2 weeks)," thereby directing the prescribers' choice regarding dosage.  The designations themselves are peculiar as the Compounded Products 21st Century purports to provide are

measured in grams (a measurement of mass), not milliliters (a measurement of volume).  In almost every instance, the Prescribing Doctors circle "300 ML," but 300 grams (or about 10 ounces) are provided.  None of the prescriptions for the Compounded Products identifies why a Compounded Product was necessary, why a commercially available FDA-approved drug would not be appropriate, or reference any patient condition that necessitates the prescribed drug, let alone a compound of any kind.

112.   Form prescriptions issued by 21st Century for its Compounded Products violate provisions of New York law whose purpose is clearly to prevent the kinds of practices these prescriptions represent, including the following:

- The listing of multiple predetermined Compounded Products from which physicians can select violates New York Education Law § 6810(7)(a).  *See* N.Y. Educ. Law § 6810(7)(a) ("No prescription for a drug written in this state by a person authorized to issue such prescription shall be on a prescription form which authorizes the dispensing or compounding of any other drug.  No drug shall be dispensed by a pharmacist when such prescription form includes any other drug.").

- The use of blank forms in which a physician's name is handwritten violates New York Education Law § 6810(8).  *See* N.Y. Educ. Law § 6810(8) ("Every prescription (whether or not for a controlled substance) written in this state by a person authorized to issue such prescription and containing theprescriber's signature shall, in addition to such signature, be imprinted or stamped legibly and conspicuously with the printed name of the prescriber who has signed the prescription."); *see also Izzo v. Manhattan Med. Grp., PC*, 164 A.D.2d 13, 560 N.Y.S.2d 644 (1990).

- None of the form prescriptions contains the following language required on every prescription in New York:   "THIS PRESCRIPTION WILL BE FILLED GENERICALLY UNLESS PRESCRIBER WRITES 'd a w' IN THE BOX BELOW."  N.Y. Educ. Law § 6810(6)(a).

113.   Some prescriptions written by the Prescribing Doctors for 21st Century's Compounded Products were on what appear to be official New York prescription forms.  *See*Ex. 5.  However, the prescriptions for 21st Century's Compounded Products on these forms almost

always were stamped, rather than written.  For example, both Morley and Ajudua, practicing in two different locations, used the same prescription stamp to prescribe the same 21st Century Compounded Products to different patients: "ANTIINFLAMMATORY NEUROPHATIC [*sic*] PAIN CREAM FBGCL CREAM (240 G) FLUBIPROFEN [*sic*] 20% BACLOFEN 2% CYCLOBENZAPRINE 2% GABAPENTIN 10% LIDOCAINE 5% VERSAPRO BASE CREAM 59% SIG: APPLY TO AFFECTED AREA 3 TO 4 TIMES DAILY." *See* Ex. 5.  These stamps also appear to have been provided by 21st Century.

114.    The form prescriptions, referencing 21st Century by name and its contact information and limited formulations, violate New York laws whose purposes certainly include preventing pharmacies from providing physicians with blank forms containing a predetermined list of medications and limited options in an effort to direct physicians' decisions, limit patients' choices, and hinder effective care.  Use of the form assured that a prescriber would order one of the limited number of formulations provided by 21st Century, all but guaranteed that patients would fill their prescriptions with 21st Century, and helped ensure that prescriptions eventually arrived at 21st Century to be filled.  Moreover, as the forms reflect, 21st Century's Compounded Products were not the product of a prescription necessary to address the unique needs of any individual patient but rather were manufactured by 21st Century and provided across many patients by different physicians without regard to the particular circumstances of any one patient.  By providing these form prescriptions to the Prescribing Doctors, 21st Century and the Management Group were orchestrating the delivery of a limited number of mass produced Compounded Products that were not uniquely tailored to the individual needs of any particular patient.  The Prescribing Doctors' use of these prescription forms to prescribe 21st Century's Compounded Products at different locations to different patients demonstrates that 21st

36

Century's Compounded Products were not prescribed to address the unique needs of any individual patient.

115.    Both 21st Century and the Prescribing Doctors know that the Compounded Products are not medically necessary and not reimbursable.  SFMA and SFF are aware of fewer than approximately 10 physicians who actually wrote the majority of prescriptions for 21st Century Compounded Products in New York.  There is no reason that so few doctors prescribed such a high proportion of 21st Century's Compounded Products unless there were financial arrangements, which include the payment of kickbacks, between 21st Century, Express Billing, the Management Group, and/or the Shell Companies with (a) individuals in charge of locations at which patients are treated; (b) Prescribing Doctors; and (c) marketers who in turn have financial arrangements with individuals in charge of locations at which patients are treated and/or with Prescribing Doctors.

116.    In addition to the forms themselves, 21st Century and the Management Group took further steps to ensure that patients obtain their products from 21st Century.  21st Century, the Management Group, and marketers retained by them provide 21st Century prescription forms to Prescribing Doctors and to locations at which patients treat, and then collect the forms after they have been completed and signed.  One of the Prescribing Doctors, Dr. Noel Howell ("Howell") testified that a 21st Century representative comes to his office once every week or two weeks to pick up the prescriptions for 21st Century's Compounded Products.  Howell acknowledged that when he prescribes medications other than 21st Century's Compounded Products and patches, he gives the prescriptions to the patient for the patient to take to the pharmacy of his or her choice.  Similarly, emails reflect that marketers routinely collected patient prescriptions for 21st Century products directly from doctors or clinic employees and emailed or

faxed them to 21st Century.   Other communications reflect that Prescribing Doctors sent prescriptions for Compounded Products directly to 21st Century, including to Itskhakov, rather than providing them to patients to have them filled at a location of their choice.   Patients have testified that, instead of being given prescriptions for the Compounded Products by the Prescribing Doctors to fill at a pharmacy of their choice, they receive the Compounded Products either at the Prescribing Doctor's office or by mail.   A patient of Ajudua's testified that his prescription for a Compounded Product was given to "[t]he ladies at the front desk" and that he received the Compounded Product thereafter through the mail.

117.   This conduct is intended by 21st Century, the Management Group, and the Prescribing Doctors to ensure that the Prescribing Doctors prescribe one of the predetermined formulations on the 21st Century form prescriptions and that patients obtain Compounded Products only from 21st Century.   The same or similar Compounded Products could be obtained from many other suppliers and there is therefore no legitimate reason why prescriptions should be directed to 21st Century.

### G.   The Management Group Created Boilerplate Letters Of Medical Necessity And Provided Them to Doctors

118.   In addition to form prescriptions and stamps, 21st Century purports to support its claims with form letters of medical necessity that the Prescribing Doctors sometimes complete and sign.   *See, e.g.*, Ex. 6.

119.   The form letters of medical necessity are prepared by 21st Century and provided to Prescribing Doctors to sign and return.   One version of the letter appears to have been prepared by marketer Anthony DiPietro, who references his work in an August 3, 2015 email sent to Alishayev, "[t]alk to the girls, let me know what you think of this letter of medical necessity in lieu of what you are currently using?   This wouldn't fit on the pad, this is just

something we would use as a template for them [*i.e.*, doctors] to sign off on." Another was prepared by a 21st Century employee who sent a template letter of medical necessity with certain highlighted fields to Itskhakov on March 29, 2017, including "*drug, dosage, amount, and duration*," telling Itskhakov to "[l]ook at this [letter of medical necessity] and see what you think? I wanted to make it a bit easier for the Drs to fill out. We would fill in the highlighted areas and the dr would fill in the Diagnosis and check off the boxes that apply and sign it." (Emphasis added).

120.    The letter of medical necessity generally used by 21st Century to support its claims is a boilerplate form that provides spaces to mark any side effects the patient has had from commercially available oral medications. Ex. 6. The Prescribing Doctors almost never indicate the patient experienced any of the potential side effects from commercially available products. *See, e.g.*, *id.* The letter of medical necessity also includes a section for the physician to indicate why he or she "is prescribing a specially compounded medication" by marking a predetermined list of reasons. The Prescribing Doctors invariably mark at least one of these reasons (and sometimes all of them), *see, e.g.*, *id.*, despite almost never providing any support for those reasons. In several instances, the Prescribing Doctors indicate on the letter of medical necessity that "[t]he patient is intolerant of commercially available products" even though no "side effects from commercially available oral medications" included on the form have been checked. None of these letters substantiates any of the reasons given for why a Compounded Product was prescribed. Several of the Prescribing Doctors signed the form letters of medical necessity purporting to identify various generic, preprinted reasons for why the Compounded Products were purportedly necessary with little to no support for those reasons. *See, e.g.*, *id.*

121.    The letters of medical necessity are not credible.  That so few doctors prescribed such a high proportion of 21st Century's Compounded Products and that Prescribing Doctors would sign such non-credible letters of medical necessity cannot be explained absent financial arrangements.

**H.    21st Century Obtains Prescriptions For Compounded Products Through Financial Arrangements With Individuals In Charge Of Locations At Which Patients Are Treated, Prescribing Doctors, And Marketers**

122.    Defendants know that 21st Century's Compounded Products are notmedically necessary.  They also know that the drugs are not compounded for individual patients to accommodate unique patient needs, but rather are mass-produced medications that should have been subjected to the FDA-approval process but were not.  In order to be able to provide the Compounded Products to patients, bill for them, and obtain reimbursement, 21st Century required prescriptions from physicians.  But physicians would have no legitimate reason to prescribe 21st Century's Compounded Products because they were medically unnecessary and, among other things, there is no reason to provide 21st Century's expensive Compounded Products, whose efficacy is undocumented and unsupported, when there are other widely accepted and effective alternatives with well-documented therapeutic benefits at considerably lower cost.  To fulfill this need, 21st Century, Express Billing, the Management Group, and/or the Shell Companies entered into financial arrangements, which include the payment of kickbacks, with (a) individuals in charge of locations at which patients are treated; (b) Prescribing Doctors; and (c) marketers who in turn have financial arrangements with individuals in charge of locations at which patients are treated and/or with Prescribing Doctors.  These arrangements include but are not limited to the examples set forth below in paragraphs 123 through 156.

### 1.    Financial Arrangements At 105-10 Flatlands Avenue, Brooklyn

123.    Among the locations at which 21st Century and the Management Group had financial arrangements and from which prescriptions for Compounded Products were issued was 105-10 Flatlands Avenue in Brooklyn, NY.

124.    Dr. Andre Duhamel ("Duhamel") was a Prescribing Doctor who Khaim arranged to examine patients at 105-10 Flatlands Avenue.  In a January 25, 2017 affidavit, Duhamel explained that Khaim worked at various multi-disciplinary clinics that treat No-Fault patients and arranged for him to examine patients at three No-Fault clinics in 2015 and 2016 where he was expected to prescribe very expensive medications from 21st Century, including Compounded Products, Terocin patches, and Diclofenac gel.  Although Duhamel had been practicing medicine in New York since May 1993, he had never before prescribed any of these medications from any source for any patient.  In or about the spring of 2015, Duhamel's friend "Peter" (*i.e.*, Khaim) arranged for him to examine patients for Starrett City Medical, P.C. ("Starrett City Medical") at 105-10 Flatlands Avenue.

125.    Starrett City Medical is owned on paper by Ajudua, who has had a substantial relationship with 21st Century.  In fact, from April 2014 to February 2016, Ajudua prescribed the Compounded Products for State Farm Insureds at least 80 times.  *See* Ex. 1.  When Duhamel worked at Starrett City Medical, Ajudua and the staff advised him that it was Starrett City Medical's regular practice to prescribe Terocin patches and Diclofenac gel when patients were initially examined, and Khaim directed Duhamel to prescribe these specific products.  Prior to working at Starrett City Medical, Duhamel had never prescribed these kinds of medication to any patient.

126.    Khaim had other substantial financial relationships with the 105-10 Flatlands Avenue location and Starrett City Medical.  Specifically, in July 2015, which is about the time Khaim arranged for Duhamel to examine patients for Starrett City Medical and Ajudua prescribed Compounded Products for patients at 105-10 Flatlands Avenue, Starrett City Medical entered into a five-year lease for space at this location with a Shell Company owned by Khaim, A&P Holding.  Pursuant to the lease, █████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ Starrett City Medical made a $50,000 payment to █████████████████ owned by Khaim, K&L Consultants, ████████████████████████████████ ████████████████████████ owned on paper by Arkadiy Khaimov (Khaim's brother) and Oksana Poltilova (who on information and belief is Khaim's wife):  AAA Wholesale Supply Inc ("AAA Wholesale Supply") and NY Collection Services Inc. ("NY Collection Services").  Ajudua, Starrett City Medical, Khaim, K&L Consultants, ███████████████████████████████████ ███████ have  not produced any agreement, communication, or other document reflecting any reason, or goods or services provided by K&L Consultants, ███████████████████████ ████████████████████████████████ Furthermore, in response to interrogatories, Ajudua failed to identify any of these companies as having provided any goods or services to him or any business with which he has been associated, including Starrett City Medical.

127.    From June 2014 through December 2017, Metro Pain Specialists P.C. ("Metro Pain Specialists") also subleased space from Starrett City Medical at 105-10 Flatlands Avenue. During the same period, one of the Prescribing Doctors, Popa, who worked for Metro Pain

Specialists, prescribed Compounded Products from 21st Century to State Farm Insureds.  *See* Ex. 1.

128.  During the period 21st Century and the Management Group had financial arrangements at 105-10 Flatlands, at least Ajudua and Popa prescribed 21st Century Compounded Products for patients who treated at that location.  Ultimately, Ajudua prescribed 21st Century Compounded Products for State Farm Insureds between April 2014 and February 2016, for which 21st Century charged more than $218,000.  Popa prescribed 21st Century Compounded Products for State Farm Insureds between December 2014 and April 2016, for which 21st Century charged more than $146,000.  *See* Ex. 1.

**2.  Financial Arrangements At 717 Southern Boulevard, Bronx**

129.  Among the locations at which 21st Century and the Management Group had financial arrangements and from which prescriptions for Compounded Products were issued was 717 Southern Boulevard in Bronx, NY.

130.  In July 2015, Khaim arranged for Duhamel to examine patients at 717 Southern Boulevard.  Specifically, in July 2015, Khaim introduced Duhamel to "Kate," who was in charge of the clinic at 717 Southern Boulevard.  Kate offered to pay Duhamel $1,000 per day to examine patients at the clinic two days per week, plus $5,000 per month to open a medical professional corporation that would operate from this location.  Duhamel agreed to this arrangement, and Morris Park Primary Medical Care, P.C. ("Morris Park Medical"), which Duhamel owned on paper, began to operate from this location.

131.  Although Duhamel was identified as the paper owner of Morris Park Medical, he did not, in fact, have any true ownership or control over this professional corporation.  Instead, Kate was the boss and was in charge of the professional corporation.  Duhamel had no role in

43

hiring or firing staff for Morris Park Medical.  All of the people who worked for the professional corporation were already in place before he became involved at the 717 Southern Boulevard location.  When Duhamel began working at 717 Southern Boulevard, Kate told him to sign a lease agreement, but to his knowledge he never paid or received any rent for that location.

132.    Duhamel also had no involvement or knowledge regarding how billing was handled, and his understanding is that Kate handled all of the billing through a company called Casper Billing.  In fact, in his affidavit, Duhamel stated that he had only recently become aware that Morris Park Medical had billed insurance companies for many different kinds of testing that he never performed, never hired anyone to perform, and did not know that Morris Park Medical was billing to insurance companies.  He does not know who, if anyone at all, performed these tests.  He also became aware that his examination reports were altered to reflect referrals for other testing, other professional services, and durable medical equipment, which he did not, in fact, make.

133.    Other than receiving $2,000 per week to perform initial examinations at 717 Southern Boulevard, and $5,000 per month for allowing Morris Park Medical to operate from this location, Duhamel never received any profits from the professional corporation and did not manage or control its bank accounts or finances.  Instead, Kate managed all of the finances and controlled the checkbook and bank accounts.

134.    When Duhamel first became involved at 717 Southern Boulevard, the location already had a relationship with 21st Century.  Kate gave Duhamel a pad of 21st Century's pre-printed prescription forms and told Duhamel to use them to prescribe Terocin patches, Diclofenac gel, and other medications for the patients he examined at that location.  Kate also gave him a rubber stamp he could use to prescribe Diclofenac gel on his own prescription pads.

135.    The only 21st Century medications Dr. Duhamel prescribed for his patients at 717 Southern Boulevard were Terocin patches and Diclofenac gel.  He prescribed them at initial evaluations but never prescribed refills.  When he prescribed them, he would hand write them on the last page of the initial examination reports.  He never actually prescribed or intended to prescribe Compounded Products from 21st Century.  However, before signing his affidavit, Duhamel was able to review samples of prescriptions that he allegedly authorized, one of which is attached to his affidavit.  From his review, it was clear to Duhamel that prescription forms were altered without his authorization to indicate that he had ordered Compounded Products from 21st Century when he had not.

136.    Prescriptions from Duhamel for Compounded Products provided by 21st Century were submitted to SFMA and SFF.  Like the prescriptions described in the Duhamel affidavit, these prescriptions purport to reflect that Duhamel ordered 21st Century Compounded Product GP1, *see* Ex. 7, but Duhamel's initial examination reports for these same patients show that he only ordered Terocin patches and Diclofenac gel for them, *see* Ex. 8.

137.    During the period 21st Century and the Management Group had financial arrangements at 717 Southern Boulevard, Kulesza and Popa also prescribed 21st Century Compounded Products for patients who treated at that location.  Ultimately, Kulesza prescribed 21st Century Compounded Products for State Farm Insureds between April 2015 and October 2015, for which 21st Century charged more than $25,000.  Popa prescribed 21st Century Compounded Products for State Farm Insureds between December 2014 and April 2016, for which 21st Century charged more than $146,000.  *See* Ex. 1.

45

### 3.     Financial Arrangements At 2 Wilson Place, Mount Vernon

138.    Among the locations at which 21st Century and the Management Group had financial arrangements and from which prescriptions for Compounded Products were issued was 2 Wilson Place in Mount Vernon, NY.

139.    In 2016, Khaim arranged for Duhamel to examine patients at 2 Wilson Place in Mount Vernon (the "Mt. Vernon Clinic").    Specifically, Khaim introduced Duhamel to Nate Cole who was in charge of the Mt. Vernon Clinic.  Cole agreed to pay Duhamel $2,000 per week to perform initial and follow-up examinations on the patients at the Mt. Vernon Clinic, plus another $5,000 per month to open a professional corporation at the location.

140.    On Duhamel's first day at the clinic, Cole told Duhamel that Khaim is affiliated with 21st Century and Cole asked Duhamel to prescribe 21st Century products.  In that regard, Cole gave Duhamel three different rubber stamps for Compounded Products and told Duhamel to use those stamps to prescribe the Compounded Products on his own prescription pad. Duhamel informed Cole that he would not prescribe the 21st Century Compounded Products, but a couple of days later Khaim called Duhamel and warned him that he would not be working at the Mt. Vernon Clinic for long if he did not prescribe the Compounded Products.  Despite this warning from Khaim, Duhamel refused to prescribe 21st Century's Compounded Products for patients at the Mt. Vernon Clinic.  On or about December 1, 2016, after Duhamel had been working at the Mt. Vernon Clinic for about two months, Cole kicked him out of the clinic based on a dispute over money.

141.    Bank records reflect that three of Khaim's Shell Companies — New Business Resources Group, P&K Marketing, and K&L Consultants — as well as another Shell Company owned by Alishayev's father, Personal Tech, paid Cole and a company he owned, NC Systems,

Inc. ("NC Systems") at least $71,000 between April 2014 and April 2016.  Alishayev, Khaim, and these Shell Companies have not produced any agreement, communication, or other document reflecting any reason, or goods or services provided by Cole or NC Systems ████████

████████

142.  During the time period when the Shell Companies paid Cole and NC Systems at least $71,000, Prescribing Doctor Varuzhan Dovlatyan, M.D. ("Dovlatyan") treated patients at 2 Wilson Place and prescribed Compounded Products from 21st Century to State Farm Insureds who treated at that location.  Ultimately, Dovlatyan prescribed 21st Century Compounded Products for State Farm Insureds between August 2014 and April 2016, for which 21st Century charged more than $264,000.  *See* Ex. 1.

### 4.    Financial Arrangements At 205-07 Hillside Avenue, Hollis.

143.  Among the locations at which 21st Century and the Management Group had financial arrangements and from which prescriptions for Compounded Products were issued was 205-07 Hillside Avenue in Hollis, NY.

144.  Ajudua was the paper owner of Hollis Novel Comprehensive Medical P.C. ("Hollis Novel Medical") at 205-07 Hillside Avenue, and he prescribed 21st Century Compounded Products for patients he examined at this location.  During the same period of time, from September 2014 to October 2016, Hollis Novel Medical ████████████████████

████████████████████████████████████████████

████████████████████████ Although Ajudua claims he had a verbal agreement for Anturio Marketing to provide marketing services for an undisclosed period of time, Ajudua, ████████████████████████████████████

████████████ are unable to produce any agreement, communication, or other document reflecting

any reason, or goods or services provided by ███████████████████████████

Furthermore, in response to interrogatories, Ajudua failed ████████████████

(other than an allegedly verbal marketing agreement with Anturio Marketing) as having provided

any goods or services to him or any business with which he has been associated, including Hollis

Novel Medical.

145.    Similarly, from June 2014 through December 2015, Metro Pain Specialists also

subleased space from Hollis Novel Medical at 205-07 Hillside Avenue.  During the same period,

Popa, who worked for Metro Pain Specialists, prescribed 21st Century Compounded Products to

State Farm Insureds who treated at that location.

### 5.    Payments To Marketers Tommy Novakov, Gloria Novakov, and Tommy Novakov Business Services, Inc.

146.    In October 2015, 21st Century entered into a marketing contract with Tommy

Novakov Business Services, Inc. ("Novakov Business Services") pursuant to which 21st Century

was to pay $5,000 per month.

147.    Between November 2015 and October 2016, 21st Century paid Novakov Business

Services and Tommy Novakov $67,000.  In addition, during this timeframe, Gloria Novakov was

paid approximately $10,000 as an employee of 21st Century.

148.    In addition to the above-described payments from 21st Century, during the same

period from October 2015 through April 2016, two of Khaim's Shell Companies (A&P Holding

and P&K Marketing) and a Shell Company owned by Alishayev's father (Personal Tech) paid

Novakov Business Services almost $20,000.  Yet, none of these Shell Companies nor Novakov

Business Services is able to produce any agreement, communication, or other document

reflecting any reason, or goods or services provided by the Novakovs or Novakov Business

Services, for these payments.

149.    During the same period that these payments were being made by 21st Century and the Shell Companies, Tommy Novakov withdrew more than $200,000 in cash from his business accounts.

150.    Alishayev testified that Prescribing Doctor Lyonel Paul, M.D. ("Paul") introduced him to Tommy Novakov, and Paul began prescribing 21st Century Compounded Products at about the same time that 21st Century and the Shell Companies began making the above-described payments.  Paul then stopped prescribing the Compounded Products about when the payments from 21st Century and the Shell Companies stopped.  During this period of time, Paul prescribed 21st Century Compounded Products for State Farm Insureds for which 21st Century charged more than $57,000.  *See* Ex. 1.

### 6.    Payments To Marketer Anthony DiPietro And His Businesses

151.    From June 2015 through at least February 2018, ███████████████████ █████████ two companies owned by Anthony DiPietro ("DiPietro") — Krisco Health, Inc. ("Krisco Health") and Billing & Coding Consultants, Inc.  Krisco Health also received checks written by Begiyev-owned Shell Company New Business Funding in October 2015 and Express Billing in January 2016.  In a November 2, 2016 email, DiPietro told Alishayev about a "new office" called Doctors United that "will be sending us scripts, Compounds, and DME."  Shortly thereafter, at least two doctors from Doctors United — Drs. Sujuata Vidyasagar and Nagaveni Rao — began prescribing 21st Century Compounded Products.  DiPietro was among the marketers who helped ensure that patients obtained their products from 21st Century by collecting prescriptions from Prescribing Doctors and emailing them or faxing them to 21st Century.  For example, on April 20, 2016, DiPietro forwarded a prescription for a 21st Century

Compounded Product to general@21centurypharmacy.com stating, "Attached is no fault patient . . . . Doc prescribed a compound cream, all pertinent paperwork is attached."

### 7. Payments To Marketer Paul Dantes And His Companies

152.   From June 2015 through June 2017, ████████████ two companies owned by Paul Dantes ("Dantes") — TOPS LLC ("TOPS") and Dantes & Dantes Corporation — ██ ████████████   TOPS also received checks written by Express Billing in August 2015, and Dantes also received checks written by Begiyev-owned Shell Company New Business Funding in December 2015.  On June 7, 2015, Dantes emailed Alishayev a spreadsheet called "Century Pharmacy Target List" that contains an "initial list of providers for pharmacy services" and lists 16 providers.   At least in September and December 2015, 21st Century sent reports to TOPS and Angelica Dantes, who is believed to be Dantes's wife, of doctors who had prescribed 21st Century products, including Compounded Products.  *See, e.g.*, Exs. 9–10.   These reports included, among other things, the name of the Prescribing Doctor, the drugs prescribed, the price, the status of a claim for reimbursement (*e.g.*, whether the charge had been paid), and even the amount of profit.  *See id.*   These reports reflected that between at least June 2015 and September 2015, five doctors working with Dantes, including two on his "initial list" — Solomon Halioua ("Halioua"), Samuel Walters, Albert Graziosa, Junhui Xie and Colin Clarke — had prescribed 21st Century Compounded Products for patients for which 21st Century charged more than $312,000.  *See* Ex. 9.[5]   They also reflected substantial profits on Compounded Products.  For example, entries indicate that 21st Century was "PAID in full" $1,774.95 for one tube of GP1 Musculoskeletal Pain Cream and secured a profit of $1,574.95.   *See* Ex. 10.

---

[5] Reports like these appear to have been provided to other marketers, including at least Sabrina Lo Duca of Tre Medical Distributors Inc. and Exit Marketing Corp.

153.    Moreover, Dantes and his companies were among the marketing companies that helped ensure that patients obtained their products from 21st Century by collecting prescriptions from Prescribing Doctors and emailing them or faxing them to 21st Century.   For example, TOPS received a prescription for a 21st Century Compounded Product and forwarded it to another marketer, JR Gateways, Inc., which sent it to Alishayev to be filled along with the instructions "this has 6 refills."   As another example, on August 27, 2016, Angelica Dantes sent Itskhakov an email attaching prescriptions that had been faxed from Prescribing Doctor Halioua and directing Itskhakov to "deliver all of the medications ASAP to the Flushing office, office manager is Juan[.]"

### 8.    Payments To Other Marketers

154.    ██████ Express  Billing, and the Shell Companies ████████████ █ at   least 17 other marketers and consultants between September 2013 and February 2018, including at least payments to: DGRD Marketing, Inc., PBS M&C LLC, Prof Med Network Services Inc., Rego Marketing, Inc., OC Consulting, LLC, Madison Garfield Consulting Group, LL Consulting Group, Inc., All Network Marketing Corp., Martinez Silverio Consulting LLC, JAR Marketing, Inc., M&L Marketing of NY Inc., Progress For Your Business, Inc., A.M.D. Consulting Service Inc., Tre Medical Distributors Inc., Exit Marketing Corp., JR Gateways, Inc., Vadim Kalontarov, and Spencer Lader.  *See* Ex. 11.  In some instances, 21st Century purports to have "marketing agreements" in which some of these entities agree to provide "marketing" for 21st Century, and there are boilerplate invoices lacking any detail as to the services provided. But with the exception of these agreements, a few boilerplate invoices, and some limited email exchanges, neither 21st Century nor any of these entities are able to provide any documents reflecting any goods or services provided by any of these marketers and consultants, actual

marketing of 21st Century's products, or justifications for these payments.    21st Century, Express Billing, and the Shell Companies paid these marketers and consultants to secure prescriptions for 21st Century Compounded Products, including through financial arrangements with individuals in charge of locations at which patients are treated and/or with Prescribing Doctors.

### 9.    Payments To Rada Kasymov, the Manager At 2363 Ralph Avenue, Brooklyn

155.    Bank records show almost $15,000 paid to Rada Kasymov, the office manager of Ralph Innovative Medical PC ("Ralph Innovative"), which operated at 2363 Ralph Avenue in Brooklyn, by three Khaim-owned Shell Companies (Anturio Marketing, K&L Consultants, and New Business Resources Group) and by one Alishayev-controlled Shell Company (Personal Tech, which is owned on paper by his father) between September 2014 and January 2016. Furthermore, in September and October 2014, when these payments were being made, Dr. Sheila Soman, the paper owner of Ralph Innovative, prescribed more than $48,000 of 21st Century Compounded Products to patients at 2363 Ralph Avenue.  *See* Ex. 1.

### 10.    The Management Group Used Shell Companies To Generate Cash

156.    The Management Group used bank accounts of the Shell Companies to generate cash.  *See* Ex. 12.  Begiyev wrote checks on at least the account of TBM Solution payable to Anturio Marketing, Logic Consulting, and New Business Resources Group that were cashed at check cashers.  *See id*.  Khaim wrote checks on at least the accounts of P&K Marketing, K&L Consultants, and New Business Resources Group payable to Anturio Marketing, Logic Consulting, K&L Consultants, New Business Resources Group, and TBM Solution that were cashed at check cashers.  *See id*.

157.    When checks were cashed, Begiyev endorsed some of these checks on behalf of Shell Companies that he did not own (Anturio Marketing and New Business Resources Group), and Khaim endorsed some of these checks on behalf of TBM Solution, which he did not own. *See id*.

158.    All of the checks were under $10,000, with quite a few just under $10,000.  On numerous occasions, multiple checks were cashed on the same day at the same location.  *See id*. For example, on March 5, 2015, three checks were cashed at Jay Payroll Services Inc.:  (1) a check from P&K Marketing for $5,626.28 payable to Anturio Marketing signed by Khaim and endorsed by Begiyev; (2) a check from P&K Marketing for $9,860 payable to TBM Solution signed by Khaim and endorsed by Begiyev; and (3) a check from K&L Consultants for $6,540 payable to New Business Resources Group signed by Khaim and endorsed by Begiyev.

159.    There is no legitimate reason for the Shell Companies to have written checks to each other and then converted those checks to cash or to have written multiple checks on the same day, each under $10,000, that were cashed.

**I.    Money Funneled To The Defendants Through The Shell CompaniesUnder The Guise of Legitimate Transactions**

160.    Defendants owned Shell Companies that received and made payments to advance the scheme.  As discussed above, the Shell Companies sometimes engaged in transactions with individuals in charge of locations at which patients are treated, Prescribing Doctors, and marketers to help secure prescriptions for 21st Century Compounded Products.  In addition, payments were made by ███████████ Express Billing to the Shell Companies in order to transfer fraudulently and unjustly obtained proceeds from the activity of 21st Century to the Management Group while hiding the Management Group's responsibility for the conduct and the amount of proceeds they were receiving from the conduct.  In fact, while Khaim and Begiyev

were both involved in and responsible for the activity of 21st Century, neither ever received a direct payment from 21st Century.  Examples of such transactions include the transactions described below in paragraphs 161 through 187.

1.  **Companies Owned By Alishayev And A Shell Company Owned By Alishayev's Father**

     **a.**     **AA 106-47 LLC**

161.   From June 2014 to January 2015,  AA 106-47 LLC ("AA 106-47"), a company owned by Alishayev. AA 106-47 are unable to produce any agreement, communication, or other document reflecting any reason, or goods or services provided by AA 106-47, as "rent," but the memo sections on these checks include not only references to "rent," but to "drink," "beer," and "Marketing Business."

     **b.**     **General Supply of NY, Inc.**

162.   From July 2015 to February 2016,  General Supply, a company owned by Alishayev. are for "W-2." General Supply are unable to produce any agreement, communication, or other document reflecting any reason, or goods or services provided by General Supply

     **c.**     **Personal Tech**

163.   From May 2015 to January 2017, 21st Century wrote checks for more than $1.45 million to Personal Tech, a Shell Company owned on paper by Alishayev's father.  Some of these payments were made through two checks written on the same day and sometimes three

checks written in less than a week.  For example, on June 15, 2015, 21st Century wrote two checks to Personal Tech for $12,596 and $20,589, and then on June 19 wrote two additional checks to Personal Tech for $38,966 and $25,299.   There is a "General Services Agreement" dated July 1, 2016 between 21st Century and Personal Tech.   But the perfunctory document provides only that Personal Tech will provide 21st Century with "Delivery Services" for "a fixed amount of $30.00."  It provides no further description of the services or even how compensation will be calculated, and is dated more than a full year after 21st Century started paying Personal Tech.  Indeed, by the time the agreement was executed, 21st Century had already paid Personal Tech over $900,000.   21st Century's general ledgers describe the payments as being for "delivery services," and memos on some checks reference invoices.  There are some invoices, but the invoices are generic documents without any detail other than identifying a date on which a purported delivery occurred and a charge.  For example, one form contains lines that say only "Quantity 172," "DELIVERY MONDAY 2/29/16," "Rate 30.00," and "Amount 5160.00."  Even if the invoices reflected legitimate services purchased at fair market value, they account for less than $340,000 of the more than $1.45 million that 21st Century paid to Personal Tech.  Other than the perfunctory agreement, a business associate agreement governing the confidentiality of information, and the invoices, Alishayev, 21st Century, and Personal Tech have not produced any communication or other document reflecting any reason, or goods or services provided by Personal Tech, for these payments.

       **2.** ██████████████████████████ **Shell Companies Owned By Khaim**

        **a.**    **A&P Holding**

    164.    From May 2015 to July 2015, ████████████████████████████ A&P Holding, a Shell Company owned by Khaim.  A&P Holding purports to be a "real estate

management/construction/consulting business," according to A&P Holding's Citibank Business

Deposit Account Application, and ███████████████████████████████████████

█████    But there are no rental agreements between ████████  A&P Holding, and ███

█████████  landlord at its only location since 2013 ████████████████████████

██████████████████████████████████████  A&P H olding is able to produce

any agreement, communication, or other document reflecting any reason, or goods or services

provided by A&P Holding ██████████████

### b.    Anturio Marketing

165.    From May 2014 to February 2016, █████████████████████████████

████████  Anturio Marketing, a Shell Company owned by Khaim.  The only documents ███

████████  Anturio Marketing produced are a written "marketing" agreement and several

invoices.  But the November 1, 2014 marketing agreement was executed after ████████████

██████████████████████  and the invoices are generic documents stating only that

"marketing" services were performed during a given month for ████████    Moreover, the

invoices account for only $115,000 █████████████████████████████████████

███████

### c.    K&L Consultants

166.    From May 2014 to June 2015, 21st Century wrote checks for more than $184,000

to K&L Consultants, a Shell Company owned by Khaim.  While 21st Century's general ledgers

describe these payments as being for "marketing," 21st Century, Khaim, and K&L Consultants

have not produced any agreement, communication, or other document reflecting any reason, or

goods or services provided by K&L Consultants, for these payments.

### d.   Logic Consulting

167.   From August 2014 to August 2015, ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇ Logic Consulting, a Shell Company owned by Khaim.  ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ "consultin g," ▇▇▇▇▇▇▇

Logic Consulting have not produced any agreement, communication, or other document

reflecting any reason, or goods or services provided by Logic Consulting ▇▇▇▇▇▇

### e.   New Business Resources Group

168.   From March 2014 to July 2015, ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇ New Business Resources Group, a Shell Company owned by Khaim.  ▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ "marketing"  and "consulting,"

▇▇▇▇▇▇▇ New Business Resources Group have not produced any agreement,

communication, or other document reflecting any reason, or goods or services provided by New

Business Resources Group ▇▇▇▇▇▇▇

### f.   P&K Marketing

169.   From December 2014 to January 2015, 21st Century wrote two checks for more

than $25,000 to P&K Marketing, a Shell Company owned by Khaim.  While 21st Century's

general ledgers describe one of these payments as being for "W-2," 21st Century, Khaim, and

P&K Marketing have not produced any agreement, communication, or other document reflecting

any reason, or goods or services provided by P&K Marketing, for these payments.

### 3.   ▇▇▇▇▇▇▇▇▇▇▇ Companies Owned By Khaim's Family Members

170.   ▇▇▇▇▇▇▇▇▇▇ com panies owned by Khaim's family members.

171.   From April 2014 to May2015, ▇▇▇▇▇▇▇▇▇▇

▇ AAA Wholesale Supply, a company owned by Khaim's brother, Arkadiy Khaimov.  ▇▇▇

██████████████████████████████████████████████████████ "purchases," ██████████

██████████ AAA Wholesale Supply is able to produce any agreement, communication, or other document reflecting any reason, or goods or services provided by AAA Wholesale Supply███

██████████████

172.    From October 2014 to February 2018, ████████████████████████████

██████████ ABE Acq LLC ("ABE Acq"), a company owned by Khaim's brother, Arkadiy Khaimov. ████████████████████████████████████████████████

"purchases" and "office repairs," and the memo sections of some checks reference "construction," "fixture," and "material," ██████████████████ABE Acq is able to produce any agreement, communication, or other document reflecting any reason, or goods or services provided by ABE Acq██████████████████

173.    From September 2014 to August 2015, ██████████████████████████████

██████████ BK Global Inc. ("BK Global"), a company owned by Khaim's father, Boris Khaimov, but which in August 2018 Alishayev claimed he now owns.  While ████████████

█████████████████████████████████"m arketing" and "W-2," ████████████

██████████████████████ has produced any agreement, communication, or other document reflecting any reason, or goods or services provided by BK Global████████████████

174.    From March 2017 to September 2017, █████████████████████████████████

██████████ NY Collection Services, a company owned by Poltilova, who on information and belief is Khaim's wife. ████████████████████████████████████████

"collection," and there are some invoices.  But the invoices are generic documents without any detail other than stating "collection" for a particular month and a charge.  Other than these generic invoices, ████████████████████ NY Collection Services is able to produce any

agreement, communication, or other document reflecting any reason, or goods or services provided by NY Collection Services█████████████████████.

**4.** ████████████████████████ **Shell Companies Owned By Begiyev**

175. ███████████████████ Shell Companies owned by Begiyev.

### a.   New Business Funding

176.   From November 2015 to May 2017, 21st Century wrote checks for more than $1.55 million to New Business Funding, a Shell Company owned by Begiyev.  21st Century general ledgers and the list of 21st Century loans produced by 21st Century in this case indicate that more than $1,057,000 of these payments were loan repayments.   But the list of loans identifies only $552,000 in purported loans by New Business Funding to 21st Century, and Alishayev, Begiyev, 21st Century, and New Business Funding have not produced any agreement, communication, or other document regarding the purported loans from New Business Funding to 21st Century.  21st Century's general ledgers describe almost $500,000 of the payments as for "consulting."   But 21st Century, Begiyev, and New Business Funding have not produced any agreement, communication, or other document reflecting any reason, or goods or services provided by New Business Funding, for these payments.

### b.   TBM Solution

177.   From August 2014 to August 2015, ██████████████████████████████  ██████████ to TBM Solution, a Shell Company owned by Begiyev.  ██████████████████████ ██████████████████████████████"consulting," █████████████████████TBM Solution have not produced any agreement, communication, or other document reflecting any reason, or goods or services provided by TBM Solution█████████████.

### c.    TAR Group

178.    From June 2014 to August 2015, 

to TAR Group, a Shell Company owned by Begiyev.

"consulting,"                                          and TAR

Group have not produced any agreement, communication, or other document reflecting any

reason, or goods or services provided by TAR Group

### 5.    Money From 21st Century Was Funneled To The Management Group Through Transfers From Express Billing To The Shell Companies

179.    Money was also transferred from 21st Century through Express Billing to the

Shell Companies.  Express Billing was formed by Itskhakov on or about July 30, 2014.  Between

its formation and March 2018, 21st Century paid Express Billing more than $2.2 million.

Express Billing then wrote checks to the Shell Companies in order to transfer fraudulently and

unjustly obtained proceeds from the activity of 21st Century to the Management Group and their

Shell Companies while hiding the Management Group's responsibility for the conduct and/or the

amount of proceeds they were receiving from the conduct.

### a.    Express Billing Made Payments To Alishayev's Companies

180.    From November 2016 to January 2017, Express Billing wrote checks for at least

$30,000 to General Supply, a company owned by Alishayev.  Express Billing, Alishayev, and

General Supply are unable to produce any agreement, communication, or other document

reflecting any reason, or goods or services provided by General Supply, for these payments.

181.    In April and June 2015, Express Billing wrote checks for more than $47,000 to

Personal Tech, a Shell Company owned on paper by Alishayev's father but, in fact, controlled by

Alishayev.  Express Billing, Alishayev, and Personal Tech are unable to produce any agreement,

communication, or other document reflecting any reason, or goods or services provided by Personal Tech, for these payments.

       **b.**       **Express Billing Made Payments To A Shell Company Owned By Khaim**

182.    From May 2016 through June 2018, Express Billing wrote checks for more than $24,000 to A&P Holding, a Shell Company owned by Khaim.   According to the memo sections of these checks the payments were for "rent."   But there are no rental agreements between Express Billing and A&P Holding, and Express Billing does not appear to have occupied any space leased to it by A&P Holding.   Express Billing, Khaim, and A&P Holding have not produced any agreement, communication, or other document reflecting any reason, or goods or services provided by A&P Holding, for these payments.

       **c.**       **Express Billing Made Payments To Entities Owned By Khaim's Family Members**

183.    From February 2015 to October 2015, Express Billing wrote checks for more than $48,000 to AAA Wholesale Supply, a company owned by Khaim's brother Arkadiy Khaimov.  Express Billing and AAA Wholesale Supply are unable to produce any agreement, communication, or other document reflecting any reason, or goods or services provided by AAA Wholesale Supply, for these payments.

184.    In March 2015 to October 2015, Express Billing wrote checks for more than $44,000 to ABE Acq, a company owned Khaim's brother, Arkadiy Khaimov.  Express Billing and ABE Acq are unable to produce any agreement, communication, or other document reflecting any reason, or goods or services provided by ABE Acq, for these payments.

185.    In June 2016, Express Billing wrote a check for almost $10,000 to BK Global, a company owned at that time by Khaim's father, Boris Khaimov, but which Alishayev claimed in August 2018 he now owns.  Express Billing and BK Global have not produced any agreement,

communication, or other document reflecting any reason, or goods or services provided by BK Global, for these payments.

### d.      Express Billing Made Payments To Shell Companies Owned By Begiyev

186.    From February 2016 to January 2017, Express Billing wrote checks for more than $119,000 to New Business Funding, a Shell Company owned by Begiyev.  Neither Express Billing nor New Business Funding has produced any agreement, communication, or other document reflecting any reason, or goods or services provided by New Business Funding, for these payments.

187.    In May and October 2015, Express Billing wrote checks for more than $13,000 to TBM Solution, a Shell Company owned by Begiyev.  Neither Express Billing nor TBM Solution has produced any agreement, communication, or other document reflecting any reason, or goods or services provided by TBM Solution, for these payments.

### J.      Money Moved Between Shell Companies, Checks Payable To One Shell Company Were Deposited Into Accounts Of Other Shell Companies, And Checks Payable To 21st Century Were Deposited Into Accounts Of Shell Companies

188.    That the Management Group acted in concert and used the Shell Companies to facilitate their activity is reflected in the facts that money moved between the Shell Companies, checks payable to some Shell Companies were deposited into accounts of other Shell Companies, checks payable to 21st Century were deposited into the accounts of Shell Companies, and members of the Management Group endorsed checks for Shell Companies owned on paper by other members of the Management Group.

189.    The Management Group regularly transferred money between the Shell Companies.  *See* Ex. 13.  None of the Shell Companies has produced any agreement,

communication, or other document reflecting any reason, or goods or services provided, for these payments.

190.   The Management Group also deposited checks payable to one ShellCompany into the accounts of another Shell Company.  *See* Ex. 14.  None of the Shell Companies has produced any agreement, communication, or other document reflecting any reason, or goods or services provided, for these payments.

191.   Checks payable to 21st Century were deposited into accounts of the Shell Companies.  For example, on November 30, 2016, a check written to 21st Century in the amount of $9,600.89 was deposited into the bank account of K&L Consultants.  On January 1, 2017, a check written to 21st Century in the amount of $8,095.99 was deposited into the bank account of New Business Resources Group.  On April 3, 2017, a check written to 21st Century in the amount of $3,853.78 was deposited into the bank account of Anturio Marketing.  Neither 21st Century nor the Shell Companies is able to provide any agreement, communication, or other document reflecting any reason, or goods or services provided, for these payments.

192.   Additionally, on occasion Khaim endorsed checks payable to TBM Solution, which is owned by Begiyev, and Begiyev endorsed checks payable to P&K Marketing, K&L Consultants, New Business Resources Group, and Anturio Marketing, which were owned by Khaim.

### K.   Defendants' Submissions To SFMA And SFF

193.   21st Century purports to provide Compounded Products directly to patients and submits bills and supporting documentation to SFMA and SFF, through Express Billing, in which 21st Century represents that the Compounded Products are medically necessary and eligible for reimbursement.  The claims, which list ingredients by item and charge separately for each, average about $2,350 and cost up to as much as almost $9,000 per tube of cream.  In fact,

Defendants knew that the Compounded Products were medically unnecessary and were not reimbursable.

194. 21st Century's charges are typically supported by a Health Insurance Claim Form (known as a "CMS-1500"), a Verification of Treatment by Attending Physician or Other Provider of Health Service ("Verification"), and an Attached Services sheet, and/or a Statement of Account, delivery slip, or other summary of the items purportedly provided to patients, each of which, among other things, lists the purported active ingredients in the Compounded Products, the quantity of each such ingredient, and the price for each such ingredient. Frequently, SFMA and SFF also receive prescriptions from the Prescribing Doctors and other providers and letters of medical necessity signed by the Prescribing Doctors.

195. 21st Century's submissions include NDC numbers, which identify the ingredients in the Compounded Products and their source and represent that 21st Century obtains virtually all of its ingredients for Compounded Products provided to State Farm Insureds from a single source, Medisca.

196. Charges submitted by a provider should reflect the proper NDC number and AWP for the drugs included in the compound as well as the quantity in which the drugs were obtained by the provider. From 21st Century's submissions, it is impossible to determine whether it actually obtained its ingredients in the quantities it represents through the NDC numbers and AWPs it uses or whether it obtained those drugs in larger quantities. If it obtained drugs in larger quantities at discounted prices, but submitted claims using NDC numbers and AWPs representing that it had obtained drugs in smaller quantities at higher prices, its representations would be fraudulent.

197.    In any event, 21st Century charges exorbitant amounts for its Compounded Products often without regard to the applicable fee schedule.  In New York, for each drug in its Compounded Products, 21st Century should charge no more than AWP minus 12% for each brand name drug and no more than AWP minus 20% for each generic drug.  Yet, 21st Century's New York charges are almost always based on the AWP without any reduction of either 12% or 20%.

198.    21st Century's prices are based on the AWPs for Medisca listed in the Red Book.  But these reported AWPs are many times the prices at which Medisca lists its drugs for sale to purchasers on Medisca's ordering system.  As a result, 21st Century's prices represent extraordinary markups over what 21st Century is likely paying its purported supplier, Medisca, for its ingredients.  For example, using Medisca's reported AWP, 21st Century charges approximately $59.85 per gram for Gabapentin.  But Medisca sells 100 grams of Gabapentin for $159 or $1.59 per gram, meaning that 21st Century's charges are almost 37 times what it likely pays Medisca for Gabapentin.  Similarly, using Medisca's reported AWP, 21st Century charges approximately $3.20 per gram for Versapro cream base.  But Medisca sells 5 kilograms of Versapro cream base for $369 or $0.0738 per gram, meaning that 21st Century charges more than 43 times what it likely pays Medisca for Versapro cream base.  Indeed, reports provided by 21st Century to marketers reflect enormous profits, including for example profits of $1,574.95 on a single tube of GP1 Musculoskeletal Pain Cream for which 21st Century charged $1,774.95.  *See* Ex. 10.  These enormous markups give 21st Century every incentive to provide medically unnecessary Compounded Products and to combine additional drugs, each of which is charged separately, in each Compounded Product.  Moreover, the Prescribing Doctors know the exorbitant cost of 21st Century's Compounded Products.  For example, when one of the

Prescribing Doctors, Howell, was asked if he knew how expensive 21st Century's Compounded Products are, he responded that he could "lie and say, I don't know, . . . but I have seen a bill, yes . . . ." Charts maintained by Express Billing reflect that 21st Century knowingly and regularly charges in excess of 20 times the cost of its Compounded Products. *See id.*

199.    Given the lack of evidence supporting the therapeutic benefits of 21st Century's Compounded Products, the availability of many commercially available, far less expensive, FDA approved oral and topical medications that are proven to be therapeutic for musculoskeletal pain and neuropathies, and the exorbitant charges that 21st Century attempts to collect, there is no legitimate reason for the Prescribing Doctors to prescribe 21st Century's Compounded Products.

200.    The Prescribing Doctors prescribe 21st Century's Compounded Products pursuant to financial or other arrangements with 21st Century that violate applicable licensing laws. Therefore, 21st Century is not eligible to collect No-Fault Benefits in New York, and it would be inequitable and contrary to the public policy of New York to allow 21st Century or the Prescribing Doctors to retain any benefits obtained from such arrangements. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

## L.    SFMA's And SFF's Justifiable Reliance

201.    Defendants are obligated legally and ethically to act honestly and with integrity. Yet, Defendants submitted or caused to be submitted to SFMA and SFF bills and supporting documentation that are fraudulent in that they represent that the Compounded Products were medically necessary and reimbursable when, in fact, they were not.

202.    SFMA and SFF are under statutory and contractual obligations to pay No-Fault Benefits promptly for medically necessary services that are lawfully rendered. The bills and supporting documents that Defendants submitted or caused to be submitted to SFMA and SFF in

support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause SFMA and SFF to justifiably rely on them.

203.    As a result, SFMA and SFF have incurred damages of more than $1.73 million in benefits paid based upon the fraudulent charges.

204.    Based upon 21st Century's, Alishayev's, Morley's, Ajudua's, Popa's, and Shakarjian's material misrepresentations and other affirmative acts to conceal their fraud from SFMA and SFF, SFMA and SFF did not discover and could not have reasonably discovered that their damages were attributable to the fraud until shortly before filing the original complaint in this action (Dkt. 1) (the "Complaint").  Furthermore, based on Express Billing's, Itskhakov's, Khaim's, Begiyev's, and the Shell Companies' material misrepresentations and other affirmative acts to conceal their fraud from SFMA and SFF, SFMA and SFF did not discover and could not have reasonably discovered that their damages were attributable to the fraud until shortly before filing this First Amended Complaint.

205.    Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature.  Only when the bills and supporting documentation are viewed together as a whole do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

206.    Moreover, the fraudulent conduct of Express Billing, Itskhakov, Khaim, Begiyev, and the Shell Companies as alleged in this First Amended Complaint arises out of the same conduct, transactions, and occurrences as those set out in the Complaint.  Express Billing, Itskhakov, Khaim, Begiyev, and the Shell Companies are so intertwined and closely related in their business activities as to have an identity of interest.  In addition, each member of the

Management Group had authority in the operation of the businesses of 21st Century and Express Billing and the fraudulent submission of bills and supporting documentation to SFMA and SFF.

## V.      CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD

**(Against 21st Century, Express Billing, the Management Group)**

207.     SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

208.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, andBegiyev intentionally and knowingly made false and fraudulent statements of material fact to SFMA and SFF by submitting or causing to be submitted bills and supporting documentation to SFMA and SFF that contained false and fraudulent representations of material fact.

209.    The false and fraudulent representations of material fact include the representations in each and every claim described in the chart attached hereto as Ex.1 that the Compounded Products prescribed and provided were medically necessary and reimbursable when, in fact, they were not medically necessary and not reimbursable.

210.    Specifically, 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev provided the Compounded Products prescribed by the Prescribing Doctors to patients, and each, together with Express Billing, submitted or caused to be submitted to SFMA and SFF fraudulent bills and supporting documentation, including the prescriptions and letters of medical necessity signed by the Prescribing Doctors.

211.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev knew that the above-described misrepresentations made to SFMA and SFF relating to the Compounded Products were false and fraudulent when they were made.

212.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev made the above-described misrepresentations and engaged in such conduct to induce SFMA and SFF into relying on the misrepresentations, and SFMA and SFF did, in fact, rely on such misrepresentations.

213.    As a result of SFMA's and SFF's justifiable reliance on these misrepresentations, SFMA and SFF have incurred damages of more than $1.73 million.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## SECOND CLAIM FOR RELIEF
## AIDING AND ABETTING FRAUD

**(Against 21st Century, Express Billing, the Management Group, the Shell Companies)**

214.    SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 and 208 through 213 above.

215.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and the Shell Companies conspired, agreed to, and acted in concert to defraud SFMA and SFF, and did defraud SFMA and SFF, through the submission of false and fraudulent statements of material fact to SFMA and SFF concerning Compounded Products.

216.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and the Shell Companies substantially assisted in defrauding SFMA and SFF.  21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev submitted or caused to be submitted bills and supporting documentation that contained false and fraudulent misrepresentations of material fact to SFMA and SFF.

217.    The false and fraudulent statements of material fact include the representations in each and every claim described in the chart attached hereto as Ex. 1 that the Compounded Products provided by 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev were medically necessary and reimbursable when, in fact, they were not medically necessary and not reimbursable.

218.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and the Shell Companies facilitated the scheme by entering into financial arrangements to obtain prescriptions and funneling payments from 21st Century to the Shell Companies in order to transfer fraudulently and unjustly obtained proceeds from the activity of 21st Century to Alishayev, Itskhakov, Khaim, and Begiyev while hiding their responsibility for the conduct and/or the amount of proceeds they were receiving from the conduct.

219.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and the Shell Companies knew that the above-described misrepresentations made to SFMA and SFF relating to the Compounded Products were false and fraudulent when they were made.  21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev made the above-described misrepresentations and each, together with the Shell Companies, engaged in such conduct to induce SFMA and SFF into relying on the misrepresentations, and SFMA and SFF did, in fact, rely upon such misrepresentations.

220.    As a direct and proximate result of the fraud, which was aided and abetted by 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and the Shell Companies, SFMA and SFF justifiably relied on the fraudulent misrepresentations of 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev, and have incurred damages of more than $1.73 million.

70

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and the Shell Companies for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

### THIRD CLAIM FOR RELIEF
### UNJUST ENRICHMENT

**(Against 21st Century, Express Billing, the Management Group)**

221.    SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

222.    SFMA and SFF conferred a benefit upon 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev by paying 21st Century's claims for Compounded Products purportedly provided to patients, and 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev voluntarily accepted and retained the benefit of those payments.

223.    Because 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev knowingly submitted or caused to be submitted to SFMA and SFF charges for Compounded Products that were not medically necessary and were not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

224.    As a direct and proximate result of the above-described conduct of 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev, SFMA and SFF have been damaged and 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev have been unjustly enriched by more than $1.73 million.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, and Begiyev for compensatory damages, plus interest and costs, and for such other relief as this Court deems equitable, just, and proper.

## FOURTH CLAIM FOR RELIEF
## COMMON LAW FRAUD

**(Against 21st Century, Express Billing, the Management Group, Morley)**

225. SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

226. 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley conspired, agreed to, and acted in concert by intentionally and knowingly making false and fraudulent statements of material fact to SFMA and SFF by submitting or causing to be submitted to SFMA and SFF bills and supporting documentation that contained false and fraudulent representations of material fact.

227. The false and fraudulent representations of material fact include the representations in each and every claim described in the chart attached hereto as Ex. 1 that the Compounded Products prescribed by Morley and provided by 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev were medically necessary and reimbursable when, in fact, they were not medically necessary and not reimbursable.

228. Specifically, Morley wrote prescriptions to patients for 21st Century's Compounded Products and letters of medical necessity purporting to support their necessity knowing that those Compounded Products were not medically necessary. 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev then provided those Compounded Products to patients, and each, together with Express Billing and Morley, submitted or caused to be submitted to SFMA and SFF fraudulent bills and supporting documentation, including the prescriptions and letters of medical necessity signed by Morley.

229.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley knew that the above-described misrepresentations made to SFMA and SFF relating to the Compounded Products were false and fraudulent when they were made.

230.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley made the above-described misrepresentations and engaged in such conduct to induce SFMA and SFF into relying on the misrepresentations, and SFMA and SFF did, in fact, rely upon such misrepresentations.

231.    As a result of SFMA's and SFF's justifiable reliance on these misrepresentations, SFMA and SFF have incurred damages of more than $430,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### FIFTH CLAIM FOR RELIEF
### AIDING AND ABETTING FRAUD

**(Against 21st Century, Express Billing, the Management Group, Morley)**

232.    SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 and 226 through 231 above.

233.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley conspired, agreed to, and acted in concert to defraud SFMA and SFF, and did defraud SFMA and SFF, through the submission of false and fraudulent statements of material fact to SFMA and SFF concerning Compounded Products.

234.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley substantially assisted in defrauding SFMA and SFF.  Morley wrote prescriptions to

patients for 21st Century's Compounded Products and letters of medical necessity purporting to support their necessity knowing that those Compounded Products were not medically necessary.

235.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley submitted or caused to be submitted to SFMA and SFF bills and supporting documentation that contained false and fraudulent misrepresentations of material fact.

236.    The false and fraudulent statements of material fact include the representations in each and every claim described in the chart attached hereto as Ex. 1 that the Compounded Products prescribed by Morley and provided by 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev were medically necessary and reimbursable when, in fact, they were not medically necessary and not reimbursable.

237.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley knew that the above-described misrepresentations made to SFMA and SFF relating to the Compounded Products were false and fraudulent when they were made.  21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley made the above-described misrepresentations and engaged in such conduct to induce SFMA and SFF into relying on the misrepresentations, and SFMA and SFF did, in fact, rely upon such misrepresentations.

238.    As a direct and proximate result of the fraud, which was aided and abetted by 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley, SFMA and SFF justifiably relied on the fraudulent misrepresentations of 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley and have incurred damages of more than $430,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

**SIXTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

**(Against 21st Century, Express Billing, the Management Group, Morley)**

239.    SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

240.    SFMA and SFF conferred a benefit upon 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley by paying 21st Century's claims for Compounded Products purportedly provided to Morley's patients identified in Exhibit 1, and 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley voluntarily accepted and retained the benefit of those payments.

241.    Because 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley knowingly submitted or caused to be submitted to SFMA and SFF charges for Compounded Products that were not medically necessary and were not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

242.    As a direct and proximate result of the above-described conduct of 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley, SFMA and SFF have been damaged and 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley have been unjustly enriched by more than $430,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Morley for compensatory damages, plus interest and

75

costs, and for such other relief as this Court deems equitable, just, and proper.

## SEVENTH CLAIM FOR RELIEF
## COMMON LAW FRAUD

**(Against 21st Century, Express Billing, the Management Group, Ajudua)**

243.   SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

244.   21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua conspired, agreed to, and acted in concert by intentionally and knowingly making false and fraudulent statements of material fact to SFMA and SFF by submitting or causing to be submitted to SFMA and SFF bills and supporting documentation that contained false and fraudulent representations of material fact.

245.   The false and fraudulent representations of material fact include the representations in each and every claim described in the chart attached hereto as Ex. 1 that the Compounded Products prescribed by Ajudua and provided by 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev were medically necessary and reimbursable when, in fact, they were not medically necessary and not reimbursable.

246.   Specifically, Ajudua wrote prescriptions to patients for 21st Century's Compounded Products and letters of medical necessity purporting to support their necessity knowing that those Compounded Products were not medically necessary.  21st Century, Alishayev, Itskhakov, Khaim, and Begiyev then provided those Compounded Products to patients, and each, together with Express Billing and Ajudua, submitted or caused to be submitted to SFMA and SFF fraudulent bills and supporting documentation, including the prescriptions and letters of medical necessity signed by Ajudua.

247.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua knew that the above-described misrepresentations made to SFMA and SFF relating to the Compounded Products were false and fraudulent when they were made.

248.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua made the above-described misrepresentations and engaged in such conduct to induce SFMA and SFF into relying on the misrepresentations, and SFMA and SFF did, in fact, rely upon such misrepresentations.

249.    As a result of SFMA's and SFF's justifiable reliance on these misrepresentations, SFMA and SFF have incurred damages of more than $128,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### EIGHTH CLAIM FOR RELIEF
### AIDING AND ABETTING FRAUD

**(Against 21st Century, Express Billing, the Management Group, Ajudua)**

250.    SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 and 244 through 249 above.

251.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua conspired, agreed to, and acted in concert to defraud SFMA and SFF, and did defraud SFMA and SFF, through the submission of false and fraudulent statements of material fact to SFMA and SFF concerning Compounded Products.

252.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua substantially assisted in defrauding SFMA and SFF.  Ajudua wrote prescriptions to

patients for 21st Century's Compounded Products and letters of medical necessity purporting to support their necessity knowing that those Compounded Products were not medically necessary.

253. 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua submitted or caused to be submitted to SFMA and SFF bills and supporting documentation that contained false and fraudulent misrepresentations of material fact.

254. The false and fraudulent statements of material fact include the representations in each and every claim described in the chart attached hereto as Ex.1 that the Compounded Products prescribed by Ajudua and provided by 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev were medically necessary and reimbursable when, in fact, they were not medically necessary and not reimbursable.

255. 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua knew that the above-described misrepresentations made to SFMA and SFF relating to the Compounded Products were false and fraudulent when they were made. 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua made the above-described misrepresentations and engaged in such conduct to induce SFMA and SFF into relying on the misrepresentations, and SFMA and SFF did, in fact, rely upon such misrepresentations.

256. As a direct and proximate result of the fraud, which was aided and abetted by 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua, SFMA and SFF justifiably relied on the fraudulent misrepresentations of 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua and have incurred damages of more than $128,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

## NINTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT

**(Against 21st Century, Express Billing, the Management Group, Ajudua)**

257.    SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

258.    SFMA and SFF conferred a benefit upon 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua by paying 21st Century's claims for Compounded Products purportedly provided to Ajudua's patients identified in Exhibit 1, and 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua voluntarily accepted and retained the benefit of those payments.

259.    Because 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua knowingly submitted or caused to be submitted to SFMA and SFF charges for Compounded Products that were not medically necessary and were not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

260.    As a direct and proximate result of the above-described conduct of 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua, SFMA and SFF have been damaged and 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua have been unjustly enriched by more than $128,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Ajudua for compensatory damages, plus interest and costs, and for such other relief as this Court deems equitable, just, and proper.

**TENTH CLAIM FOR RELIEF**
**COMMON LAW FRAUD**

**(Against 21st Century, Express Billing, the Management Group, Shakarjian)**

261.    SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

262.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian conspired, agreed to, and acted in concert by intentionally and knowingly making false and fraudulent statements of material fact to SFMA and SFF by submitting or causing to be submitted to SFMA and SFF bills and supporting documentation that contained false and fraudulent representations of material fact.

263.    The false and fraudulent representations of material fact include the representations in each and every claim described in the chart attached hereto as Ex. 1 that the Compounded Products prescribed by Shakarjian and provided by 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev were medically necessary and reimbursable when, in fact, they were not medically necessary and not reimbursable.

264.    Specifically, Shakarjian wrote prescriptions to patients for 21st Century's Compounded Products and letters of medical necessity purporting to support their necessity knowing that those Compounded Products were not medically necessary.  21st Century, Alishayev, Itskhakov, Khaim, and Begiyev then provided those Compounded Products to patients, and each, together with Express Billing and Shakarjian, submitted or caused to be

submitted to SFMA and SFF fraudulent bills and supporting documentation, including the prescriptions and letters of medical necessity signed by Shakarjian.

265.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian knew that the above-described misrepresentations made to SFMA and SFF relating to the Compounded Products were false and fraudulent when they were made.

266.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian made the above-described misrepresentations and engaged in such conduct to induce SFMA and SFF into relying on the misrepresentations, and SFMA and SFF did, in fact, rely upon such misrepresentations.

267.    As a result of SFMA's and SFF's justifiable reliance on these misrepresentations, SFMA and SFF have incurred damages of more than $97,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### ELEVENTH CLAIM FOR RELIEF
### AIDING AND ABETTING FRAUD

**(Against 21st Century, Express Billing, the Management Group, Shakarjian)**

268.    SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 and 262 through 267 above.

269.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian conspired, agreed to, and acted in concert to defraud SFMA and SFF, and did defraud SFMA and SFF, through the submission of false and fraudulent statements of material fact to SFMA and SFF concerning Compounded Products.

270.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian substantially assisted in defrauding SFMA and SFF.  Shakarjian wrote prescriptions to patients for 21st Century's Compounded Products and letters of medical necessity purporting to support their necessity knowing that those Compounded Products were not medically necessary.

271.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian submitted or caused to be submitted to SFMA and SFF bills and supporting documentation that contained false and fraudulent misrepresentations of material fact.

272.    The false and fraudulent statements of material fact include the representations in each and every claim described in the chart attached hereto as Ex. 1 that the Compounded Products prescribed by Shakarjian and provided by 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev were medically necessary and reimbursable when, in fact, they were not medically necessary and not reimbursable.

273.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian knew that the above-described misrepresentations made to SFMA and SFF relating to the Compounded Products were false and fraudulent when they were made.  21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian made the above-described misrepresentations and engaged in such conduct to induce SFMA and SFF into relying on the misrepresentations, and SFMA and SFF did, in fact, rely upon such misrepresentations.

274.    As a direct and proximate result of the fraud, which was aided and abetted by 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian, SFMA and SFF justifiably relied on the fraudulent misrepresentations of 21st Century, Express Billing,

Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian and have incurred damages of more than $97,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

## TWELFTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT

### (Against 21st Century, Express Billing, the Management Group, Shakarjian)

275.    SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

276.    SFMA and SFF conferred a benefit upon 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian by paying 21st Century's claims for Compounded Products purportedly provided to Shakarjian's patients identified in Exhibit 1, and 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian voluntarily accepted and retained the benefit of those payments.

277.    Because 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian knowingly submitted or caused to be submitted to SFMA and SFF charges for Compounded Products that were not medically necessary and were not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

278.    As a direct and proximate result of the above-described conduct of 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian, SFMA and SFF have been damaged and 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian have been unjustly enriched by more than $97,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Shakarjian for compensatory damages, plus interest and costs, and for such other relief as this Court deems equitable, just, and proper.

**THIRTEENTH CLAIM FOR RELIEF**
**COMMON LAW FRAUD**

**(Against 21st Century, Express Billing, the Management Group, Popa)**

279.   SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

280.   21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa conspired, agreed to, and acted in concert by intentionally and knowingly making false and fraudulent statements of material fact to SFMA and SFF by submitting or causing to be submitted to SFMA and SFF bills and supporting documentation that contained false and fraudulent representations of material fact.

281.   The false and fraudulent representations of material fact include the representations in each and every claim described in the chart attached hereto as Ex. 1 that the Compounded Products prescribed by Popa and provided by 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev were medically necessary and reimbursable when, in fact, they were not medically necessary and not reimbursable.

282.   Specifically, Popa wrote prescriptions to patients for 21st Century's Compounded Products and letters of medical necessity purporting to support their necessity knowing that those Compounded Products were not medically necessary.  21st Century, Alishayev, Itskhakov, Khaim, and Begiyev then provided those Compounded Products to patients, and each, together with Express Billing and Popa, submitted or caused to be submitted to SFMA and SFF

84

fraudulent bills and supporting documentation, including the prescriptions and letters of medical necessity signed by Popa.

283. 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa knew that the above-described misrepresentations made to SFMA and SFF relating to the Compounded Products were false and fraudulent when they were made.

284. 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa made the above-described misrepresentations and engaged in such conduct to induce SFMA and SFF into relying on the misrepresentations, and SFMA and SFF did, in fact, rely upon such misrepresentations.

285. As a result of SFMA's and SFF's justifiable reliance on these misrepresentations, SFMA and SFF have incurred damages of more than $89,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## FOURTEENTH CLAIM FOR RELIEF
## AIDING AND ABETTING FRAUD

### (Against 21st Century, Express Billing, the Management Group, Popa)

286. SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 and 280 through 285 above.

287. 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa conspired, agreed to, and acted in concert to defraud SFMA and SFF, and did defraud SFMA and SFF, through the submission of false and fraudulent statements of material fact to SFMA and SFF concerning Compounded Products.

288.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa substantially assisted in defrauding SFMA and SFF.  Popa wrote prescriptions to patients for 21st Century's Compounded Products and letters of medical necessity purporting to support their necessity knowing that those Compounded Products were not medically necessary.

289.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa submitted or caused to be submitted to SFMA and SFF bills and supporting documentation that contained false and fraudulent misrepresentations of material fact.

290.    The false and fraudulent statements of material fact include the representations in each and every claim described in the chart attached hereto as Ex. 1 that the Compounded Products prescribed by Popa and provided by 21st Century, Alishayev, Itskhakov, Khaim, and Begiyev were medically necessary and reimbursable when, in fact, they were not medically necessary and not reimbursable.

291.    21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa knew that the above-described misrepresentations made to SFMA and SFF relating to the Compounded Products were false and fraudulent when they were made.  21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa made the above-described misrepresentations and engaged in such conduct to induce SFMA and SFF into relying on the misrepresentations, and SFMA and SFF did, in fact, rely upon such misrepresentations.

292.    As a direct and proximate result of the fraud, which was aided and abetted by 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa, SFMA and SFF justifiably relied on the fraudulent misrepresentations of 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa and have incurred damages of more than $89,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

### FIFTEENTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT

**(Against 21st Century, Express Billing, the Management Group, Popa)**

293.   SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

294.   SFMA and SFF conferred a benefit upon 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa by paying 21st Century's claims for Compounded Products purportedly provided to Popa's patients identified in Exhibit 1, and 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa voluntarily accepted and retained the benefit of those payments.

295.   Because 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa knowingly submitted or caused to be submitted to SFMA and SFF charges for Compounded Products that were not medically necessary and were not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

296.   As a direct and proximate result of the above-described conduct of 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa, SFMA and SFF have been damaged and 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa have been unjustly enriched by more than $89,000.

WHEREFORE, SFMA and SFF demand judgment against 21st Century, Express Billing, Alishayev, Itskhakov, Khaim, Begiyev, and Popa for compensatory damages, plus interest and

costs, and for such other relief as this Court deems equitable, just, and proper.

## SIXTEENTH CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. § 1962(c)

### (Against 21st Century, Alishayev, Morley, Ajudua, Shakarjian, Popa)

297.     SFMA incorporates, adopts, and re-alleges as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

298.     21st Century, Alishayev, Morley, Ajudua, Shakarjian, and Popa constitute an association-in-fact "enterprise" (the "21st Century Pharmacy Compounding Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the 21st Century Pharmacy Enterprise are and have been joined in a common purpose, namely to defraud SFMA and other insurers by submitting or causing to be submitted bills and supporting documentation that are fraudulent for Compounded Products that were not medically necessary and/or were not legitimately reimbursable.  Although different members of the enterprise perform different roles, together they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud SFMA and other insurers through insurance claims — with sufficient longevity to accomplish that common purpose.

299.     Specifically, the Prescribing Doctors — Morley, Ajudua, Shakarjian, Popa, and others — wrote prescriptions for 21st Century's Compounded Products and signed letters of medical necessity purporting to support their necessity knowing that those Compounded Products were not medically necessary.  Those prescriptions were the result of financial arrangements, which include the payment of kickbacks, between 21st Century, the Management Group, which includes Alishayev,  and/or the Shell Companies and (a) individuals in charge of locations at which patients are treated; (b) Prescribing Doctors; and (c) marketers who in turn

88

have arrangements with individuals in charge of locations at which patients are treated and/or with Prescribing Doctors. 21st Century provided Compounded Products to patients and then 21st Century and Alishayev submitted or caused to be submitted to SFMA fraudulent bills and supporting documentation, including prescriptions signed by Prescribing Doctors. Alishayev, with the other members of the Management Group, formed 21st Century and the Shell Companies to carry out and profit from the scheme by facilitating prescriptions and bills for medically unnecessary Compounded Products, and facilitate financial arrangements with individuals in charge of locations at which patients are treated, Prescribing Doctors, and marketers to obtain prescriptions for 21st Century's medically unnecessary Compounded Products. Alishayev, with the other members of the Management Group, also owned Shell Companies that entered into financial arrangements to obtain prescriptions and received payments from 21st Century in order to transfer fraudulently and unjustly obtained proceeds from the activity of 21st Century to himself and the other members of the Management Group, while hiding his responsibility for the conduct and the amount of proceeds he and the other members of the Management Group were receiving from the conduct.

300.    21st Century's, Alishayev's, Morley's, Ajudua's, Shakarjian's, and Popa's role and participation in the scheme was necessary to the success of the scheme. No one member of the 21st Century Pharmacy Compounding Enterprise was capable of carrying out the scheme without the participation of the other members in the 21st Century Pharmacy Compounding Enterprise. Members of the 21st Century Pharmacy Compounding Enterprise have acted with sufficient longevity to achieve their common goal of defrauding SFMA through the submission of fraudulent insurance claims.

301.   21st Century, Alishayev, Morley, Ajudua, Shakarjian, and Popa are or have been employed by and associated with the 21st Century Pharmacy Compounding Enterprise.

302.   21st Century, Alishayev, Morley, Ajudua, Shakarjian, and Popa have knowingly conducted and/or participated, directly or indirectly, in the conduct of the 21st Century Pharmacy Compounding Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit or cause to submit to SFMA and other insurers bills and supporting documentation that are fraudulent in that Compounded Products provided by 21st Century, including those referenced in Exhibit 1, were not medically necessary and not reimbursable.

303.   SFMA has been injured in its business and property by reason of the above described conduct in that it has paid more than $1.23 million based upon the fraudulent charges and submissions.

WHEREFORE, SFMA demands judgment against 21st Century, Alishayev, Morley, Ajudua, Shakarjian, and Popa for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief that the Court deems just and proper.

### SEVENTEENTH CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. § 1962(d)

**(Against 21st Century, Alishayev, Morley, Ajudua, Shakarjian, Popa**

304.   SFMA incorporates, adopts, and re-alleges as though fully set forth herein each and every allegation in paragraphs 1 through 206 and 298 through 303 above.

305.   21st Century, Alishayev, Morley, Ajudua, Shakarjian, and Popa have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the 21st Century Pharmacy Compounding Enterprise's affairs through a pattern of racketeering

activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to submit fraudulent bills and supporting documentation to SFMA and other insurers for Compounded Products provided by 21st Century, including those referenced in Exhibit 1, which were not medically necessary and not reimbursable.

306.    21st Century, Alishayev, Morley, Ajudua, Shakarjian, and Popa each knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for the Compounded Products to SFMA and other insurers, which were not medically necessary and not reimbursable.

WHEREFORE, SFMA demands judgment against 21st Century, Alishayev, Morley, Ajudua, Shakarjian, and Popa for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief that the Court deems just and proper.

### EIGHTEENTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT

#### (Against 21st Century)

307.    SFMA and SFF incorporate, adopt, and re-allege as though fully set forth herein each and every allegation in paragraphs 1 through 206 above.

308.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

309.    There is an actual case and controversy between SFMA and SFF, on the one hand, and 21st Century, on the other hand, as to all charges for Compounded Products that have not been paid to date and through the trial of this case.  SFMA and SFF contend that 21st Century is not entitled to reimbursement for any of these charges.

310.    Because 21st Century has made false and fraudulent statements, otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding claims submitted to SFMA and SFF, and otherwise submitted claims and charges that are not entitled to reimbursement, 21st Century is not entitled to any coverage for No-Fault Benefits for the claims and charges at issue.

WHEREFORE, SFMA and SFF respectfully request a judgment declaring that 21st Century is not entitled to collect No-Fault Benefits for any unpaid charges to date and through the trial of this case, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), SFMA and SFF demand a trial by

jury.

Dated:  April 1, 2019
        New York, New York

                                   Respectfully submitted,


B                                      y:  *Jonathan L. Marks*

                                   Ross O. Silverman
                                   Jonathan L. Marks
                                   Matthew R. Ryan (admitted *pro hac vice*)

                                   KATTEN MUCHIN ROSENMAN LLP
                                   525 West Monroe Street
                                   Chicago, Illinois 60661-3693
                                   Telephone: 312.902.5200
                                   Facsimile:  312.902.1061
                                   Email:  ross.silverman@kattenlaw.com
                                           jonathan.marks@kattenlaw.com
                                           matthew.ryan@kattenlaw.com

                                   Christopher T. Cook
                                   KATTEN MUCHIN ROSENMAN LLP
                                   575 Madison Avenue
                                   New York, NY 10022-2585
                                   Telephone: 212.940.8800
                                   Email:  christopher.cook@kattenlaw.com