1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK

2    ------------------------------------X
                                        :
3    STATE FARM MUTUAL AUTOMOBILE       :
     INSURANCE COMPANY,                 :
4                                       :
                    Plaintiff,          : 17-CV-05845 (MKB)(VMS)
5                                       :
              v.                        :
6                                       : October 3, 2019
     21ST  CENTURY PHARMACY, INC., *et al.*,: Brooklyn, New York
7                                       :
                    Defendants.         :
8    ------------------------------------X

9

10          TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
              BEFORE THE HONORABLE VERA M. SCANLON
11                UNITED STATES MAGISTRATE JUDGE

12
     APPEARANCES:
13

14   For the Plaintiff:        JONATHAN MARKS, ESQ.
                               CHRISTOPHER COOK, ESQ.
15                             Katten Muchin Rosenman LLP
                               525 West Monroe Street
16                             Chicago, Illinois 60661

17   For the Defendants:       CHARLES HORN, ESQ.
                               JENNIFER STRONG, ESQ.
18                             The Russell Friedman Law Group, LLP
                               3000 Marcus Avenue, Suite 2E03
19                             Lake Success, New York 11042

20                             NICHOLAS BOWERS, ESQ.
                               Gary Tsirelman, P.C.
21                             129 Livingston Street
                               Brooklyn, New York 11201
22
     Court Transcriber:        SHARI RIEMER, CET-805
23                             TypeWrite Word Processing Service
                               211 N. Milton Road
24                             Saratoga Springs, New York 12866

25

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

3

1   (Proceedings began at 9:31 a.m.)

2           THE COURT:  Okay.  So, <u>State Farm Mutual Automobile</u>

3   <u>Insurance Company v. 21st Century Pharmacy, Inc., *et al.*</u>, 17-

4   CV-5845.

5           For the plaintiffs.

6           MR. MARKS:  Good morning, Your Honor.  Jonathan

7   Marks on behalf of plaintiff, State Farm Mutual Automobile

8   Insurance Company and State Farm Fire and Casualty Company.

9           MR. COOK:  Christopher Cook on behalf of the

10  plaintiffs.

11          MR. HORN:  Charles Horn on behalf of 21st Century

12  Pharmacy, Dr. Ajudua, Dr. Popa, Express Billing and Iris

13  Itskhakov.

14          MS. STRONG:  Jennifer Strong on behalf of the same

15  defendants.

16          MR. BOWERS:  Nicholas Bowers on behalf of Peter

17  Khaim, Anturio Marketing, Inc., Logic Consulting, Inc., P&K

18  Marketing Services, Inc., A&P Holding Group, Corp., New

19  Business Resources Group, Incorporated and K&L Consultants,

20  Incorporated.  Thank you, Your Honor.

21          THE COURT:  All right.  Let me just make sure I have

22  the docket right.  So for Mr. Horn's 21st Century, Alishayev,

23  Ajudua, Popa?

24          MR. HORN:  Yes, Your Honor.

25          THE COURT:  Itskhakov and Express Billing.  All

4

1  right.  Okay.  But then are you on all the same -- Ms. Strong,

2  are you on all the same ones or --

3            MS. HORN:  Yes, Your Honor.

4            THE COURT:  Okay.  So then the docket is incomplete.

5  You're not showing up with all of those defendants so --

6            MS. HORN:  Okay.

7            THE COURT:  -- you should just check with the

8  clerk's office to make sure the entries are right.

9            Okay.  So thanks for coming early.  I swapped for

10 criminal duty so here we are.  All right, so let's talk.  So,

11 one is an inquiry from Judge Brody.  Do you really need this

12 motion to dismiss?  Those are my words, not hers but I mean is

13 it likely to be successful?  Do you need a pre-motion

14 conference?

15           MR. HORN:  Yes, Your Honor.  We do believe we'll be

16 successful.

17           THE COURT:  Why?

18           MR. HORN:  I don't believe anything has changed from

19 the inception of this litigation.  I don't think there's been

20 any discovery that has furthered their cause.  In fact, I

21 think the discovery, quite frankly, has gone the other way.  I

22 think the pleadings are insufficient.  I know that discovery

23 has nothing to do with the motion to dismiss.  I'm just

24 pointing out the rationale as to why we think this is

25 necessary to get done.  Because the way my clients are viewing

5

 1   this case is this is the never-ending discovery request that

 2   keeps on continuing, notwithstanding the fact that nothing's

 3   being uncovered.  We think the pleadings are deficient.

 4          THE COURT:  All right.  Is there any -- well, all

 5   right.  I think it's not likely -- I mean I don't know, but I

 6   know Judge Brodie has an extensive trial schedule so are you

 7   likely to get a resolution on the motion to dismiss before

 8   summary judgment because the schedule here is not going to be

 9   as long as what's proposed.  So why don't you just -- it seems

10   on your probable briefing schedule you would be close to --

11   you know, to making the motion to dismiss a motion for summary

12   judgment.  So is it worth it to go through this exercise?

13          MR. HORN:  Do you want to put the -- only because

14   I'm at a disadvantage, I think Your Honor has a schedule in

15   her head.  Do you want to take this issue last and that way

16   I'd be in a much better position to --

17          THE COURT:  My thought is discovery here should wrap

18   up in the middle of next year because this is a 2017 case.

19   These issues have been floating around forever.  Just got to

20   move it.  So it's a summary judgment or to be briefed -- well,

21   that would be the pre-motion conference letter which would be

22   sometime in the middle of the summer.

23          And you can think about it because obviously this is

24   Judge Brodie, but I'm just asking, right, if you have a pre-

25   motion conference in the next couple of weeks, you have a two-

6

1  to three-month briefing schedule and that will put you to

2  February or March.  It's unlikely, you know, with this kind of

3  a case you get a decision unless there's something quickly

4  dispositive, you know, shorter than a couple of months.  All

5  right.  Well, you can -- you know, just think about it because

6  looking at this schedule.

7           Okay.  So we have the questions about the scope of

8  the discovery, some of which is very detailed which I'm not

9  sure I'm going to -- I mean I'll hear from you, but I'm not

10  sure I'm going to decide it right now, the various back and

11  forth about the motions to compel.  A lot of talk about

12  privilege and verification and disqualification.  Would you

13  like to talk about those in any particular order?  It's up to

14  you all.  Is anything a particular priority for you to be

15  heard on?

16           MR. MARKS:  Well, from plaintiff's perspective I

17  think we'd like to be -- our priority is our motion to compel

18  discovery from defendants.  I suspect defendants' priority is

19  their motion to compel us but, you know, we think it probably

20  makes sense to start with our motion to compel discovery from

21  defendants.

22           THE COURT:  Okay.

23           MR. MARKS:  But we'll assume whatever order the

24  Court would prefer.

25           THE COURT:  All right.  Let's look at this privilege

1   point.  On the plaintiff's -- well, has anyone seen -- has the

2   other side their retainer agreement or part of their retainer

3   agreement?  That would seem like -- or retainer agreements,

4   plural.  That would seem --

5             MR. HORN:  No.

6             THE COURT:  -- particularly relevant.  So what's the

7   objection to providing some or all of the retainer agreement

8   assuming there is one at least as it dealt with this issue,

9   right, because I mean to completely simplify this is this just

10  the regular course of business or was this some kind of

11  separate special investigation, research, opinion, et cetera?

12            MR. MARKS:  Well, so, Your Honor, I want to make

13  sure I'm addressing the Court's question.  We have provided --

14  as I understand defendants' motion, defendants are seeking,

15  essentially, every privilege document on our privilege log.

16            THE COURT:  Oh, right.  I'm starting at the

17  beginning which is, I think, the basis for your claim of

18  privilege that this is not a regular course of the insurance

19  business.  And so it's in a different category and they

20  shouldn't be allowed to see much of your privileged documents

21  which seem to relate to well, [indiscernible] an umbrella term

22  in investigation.  Is that wrong?

23            MR. MARKS:  Well, let me lay out what I understand

24  to be the issue, Your Honor.  So we have asserted privilege in

25  the ordinary course, under the ordinary rules that typically

8

1    apply privilege in every single case and many of the cases I'm

2    sure the Court confronts on a regular and routine basis.

3              THE COURT:  Yes.

4              MR. MARKS:  We've applied the usual, typical rules.

5    We went through our production.  We've produced over two

6    million pages of documents.  And we've asserted privilege to

7    roughly about three hundred of them.  So two million

8    documents, roughly three hundred, and we created a privilege

9    log and this is sort of the ordinary course of litigation and

10   the ordinary rule of litigation.  And we applied the typical

11   rules and the typical rules are that we've got attorney/client

12   documents and we've got work product documents.  And the

13   attorney/client documents are documents which are

14   communications between an attorney and a lawyer for purposes

15   of obtaining legal advice and the work product doctrine

16   applies to documents that are prepared in anticipation of

17   litigation.

18             THE COURT:  Right.

19             MR. MARKS:  Right.  Okay.

20             THE COURT:  Unfortunately it's not -- today we've

21   got to move it along.

22             MR. MARKS:  We've got to move fast.  So basically

23   they're claiming on exception.  Okay.

24             THE COURT:  Yep.

25             MR. MARKS:  They're trying to -- and the exception

9

1    they're claiming is made of whole cloth because there really

2    is no law to support it which is basically anything related to

3    the verification process isn't privilege.  So their theory is

4    Kattan and other lawyers worked on verification and because

5    they participated, conducted, in some way were involved in

6    verification, I don't know what they mean, but they say

7    because we were involved in verification, therefore, bam,

8    privilege gone.  Okay.

9              There's no law that supports that anywhere.  It

10   doesn't exist.  There's not a case that supports it and if it

11   existed, it would completely undermine the relationship -- it

12   would, first of all, destroy the existence of a relationship

13   for insurance companies because insurance companies are in the

14   business of doing insurance.  And if when they did insurance

15   business they couldn't have a privilege when they did

16   insurance business, there would be no privilege.  In fact, it

17   would wipe out the privilege for all businesses because any

18   time a business did its own business, it would be doing

19   business and, therefore, it couldn't have a privilege.  It'd

20   wipe out the privilege.

21             THE COURT:  Well, I don't know if that's the best

22   argument because that is exactly the problem in the insurance

23   world, right?  Is it in the ordinary course of business where

24   you're evaluating a claim then even if you have to consult

25   counsel that may not be privileged.  It depends on reason why

10

1   you're doing that but --

2           MR. MARKS:  Well --

3           THE COURT:  -- anyway, let's talk about this

4   verification and what you think it is and --

5           MR. MARKS:  Sure.  So here's the important

6   distinction, Judge, okay.  If a lawyer goes out and inspects a

7   broken car and writes a report or if a lawyer walks through an

8   arson site and collects samples and writes a report, okay,

9   that's not privilege.  That's a lawyer doing the

10  investigation, okay.  Standard makes sense.  Lawyer doing

11  investigation, okay.

12          But if an insurance company is doing its work

13  verifying a claim and it gets advice from a lawyer saying

14  these are the circumstances under which you compared my claim.

15  That's privilege.  And the law is pretty clear that just

16  because you're doing claim work doesn't mean you lose the

17  privilege, okay.  So what is it?  What's the most that they

18  can point to that we did here, okay.  What did we do?  We took

19  an EUO.  That's a deposition.

20          THE COURT:  Right.

21          MR. MARKS:  Okay.  All right.  And we sent a letter

22  to the lawyer of the deponent, of the person that's being

23  EUO'd and saying thank you for the EUO.  Now you need to send

24  us some documents because the EUO wasn't sufficient.  And who

25  do we send that lawyer to?  From lawyer to lawyer.  It is the

11

1   routine practice in New York for lawyers to represent

2   insurance carriers in connection with the EUO process, in

3   connection with the verification process.  Lawyers are part of

4   that process.  They're representing clients in the

5   verification process.

6           THE COURT:  Okay.  Is there a retainer agreement for

7   that work?  That would just clearly state that, you know,

8   we've been retained to represent you in the verification

9   process, potentially leading to litigation in state court or

10  not?

11          MR. MARKS:  I think that --

12          THE COURT:  I mean if there's not, there's not but

13  that would seem like the easiest, quick summary of your -- the

14  work that was done.

15          MR. MARKS:  I don't --

16          THE COURT:  You know, work that was anticipated to

17  be done.

18          MR. MARKS:  Well, Your Honor, I don't think there is

19  and I don't think the retainer agreement says that.

20          THE COURT:  Okay.

21          MR. MARKS:  And the attack, too, is -- as to

22  [indiscernible].  I think the attack is to other lawyers that

23  had -- that were sort of representing in the course of

24  verification.  Remember it's their --

25          THE COURT:  Yeah, the leader attorney is lower in

12

 1    the time line, right, of work done on these cases, right?

 2          MR. MARKS:  Right.

 3          THE COURT:  I mean you're at the point where you're

 4    like wait a minute, look at this overview.  We think there's a

 5    big problem here.  These are more -- at least seemingly more

 6    individual case driven even if, you know, you're starting to

 7    suspect there's a bigger problem.

 8          MR. MARKS:  Well, well, there are a couple of

 9    things.  So there's the work associated with the larger

10    investigation, right, which is clearly in anticipation of

11    larger litigation.

12          THE COURT:  Right.

13          MR. MARKS:  So you've got to separate out some

14    investigation --

15          THE COURT:  Right.

16          MR. MARKS:  -- from other investigation.  One of the

17    things that they haven't attempted to do is you got to break

18    them apart.  But the other piece of this is that one of the

19    things we have to be very careful about is if suddenly a

20    lawyer taking the EUO and sending a letter and representing a

21    client in verification wipes out that privilege, I mean that's

22    going to reek havoc on the way in which verification is

23    conducted in New York because lawyers routinely represent

24    insurers, in fact, deal with -- they're dealing with Mr.

25    Horn's partner.  That's how this works.

13

1          Lawyers are taking EUO's every single day.  If

2     suddenly a lawyer taking an EUO wipes out the privilege, it's

3     a fundamental altering of the law.  I mean idea that simply

4     because a lawyer is involved in some way in the verification

5     process, that wipes out the privilege.  It would be the

6     fundamental altering of the way in which verification is

7     conducted in New York and a fundamental change in the

8     privilege law in the State of New York.

9          THE COURT:  My question then really of all this

10    paper is is there something that gives an indicia that there

11    was a separation between the regular course of business and

12    the insurance company and the lawyers and basically -- well,

13    the verification process which is the beginning of

14    investigating certain claims and it seems, I heard about this

15    from a variety of cases, it seems there's part of it is a

16    spot-check.  We're just going to check in every so often and

17    see if there's a problem.  That's really what the insurance

18    companies are looking for.  And some of it is we think there's

19    a problem or this claim, in and of itself, is problematic and

20    they start to deal with counsel.

21          So, you know, if it's -- if there's something that

22    describes that's either the timeline or the relationship that

23    instead of having to look at all these documents, we could

24    group them together and say look these are this kind of

25    document, these are the Katten documents and from your

14

1   perspective, you know, there's a privilege across the board.

2   There's just not so much information here about how one goes

3   from the insurance company to the lawyer's involvement.

4          MR. MARKS:  And, Your Honor, and I think I --

5   unfortunately, I don't think we're going to find -- what I

6   think the Court is thinking about and I would agree, it would

7   be wonderful if it existed, if there were a silver bullet.  If

8   there were one document that we could pull out and say look,

9   we'll, we'll show them this document and this will clearly

10  show, look, that Katten wasn't walking the arson site

11  collecting samples, Katten was providing legal advice or

12  Katten wasn't inspecting the car and writing a report.  It was

13  giving lawyerly advice and counsel, okay.  And I wish there

14  were a silver bullet that I could point to to do that.

15          Unfortunately, I think the way this is going to lay

16  out is is we've got documents and if you at each one of those

17  documents you'll see --

18          THE COURT:  I'm trying to avoid that.

19          MR. MARKS:  I know.  I know.  So let me go -- what

20  you'll see, I think, in those documents is that it's sort of a

21  negative, right?  We're sort of probing the negative which is

22  none of them involve that.  I mean I can tell you that, for

23  example, Katten doesn't make a claim decision.  Okay.  It

24  doesn't decide whether to pay or deny a claim.  There's no

25  instance of it stepping over the line, okay.

1           But one of the things that may be sort of relevant

2    to this is them taking a deposition, right?  And I would say,

3    too, that to ask -- to put the burden on us is sort of not,

4    not the way I would think it ought to play out, right?  Well,

5    they're the ones who are saying, look, you crossed the line

6    here and the most that they can say about us crossing the line

7    is Katten was involved, Katten handled, Katten participated.

8           THE COURT:  But the obvious problem is they don't

9    have the documents which is why, you know, I'm talking to you

10   first even if they're the ones who want the papers.

11          MR. MARKS:  And I'll tell you that what you have to

12   accept I think is the rules that sort of govern the ordinary

13   course of the assertion of privilege, right.  And what I can

14   tell you is that when we asserted a privilege, first of all,

15   there are documents that don't have anything to do with

16   verification.  Put those aside, we've asserted the privilege

17   as to those, and they don't get those at all.  Those aren't

18   even at issue here.

19          And then I think you have to accept that, look,

20   we've created a privilege log and if you take a look at the

21   privilege log, the privilege log is our best -- that's how it

22   works is they take a look at our privilege log and say, all

23   right, what on our privilege log -- and that they haven't done

24   is to say look, what on a privilege log actually points to

25   something that suggests that we've stepped over the line, that

16

1   we've done an investigation?

2          And if what's necessary is that we need to go back

3   and do a more fulsome description of particular documents or

4   they can point to particular documents so that maybe we can

5   limit the in-camera review if there has to be an in-camera

6   review.  I mean maybe that's the way to do it is maybe what

7   we're talking about is if, look, they can point to specific

8   documents and say, look, these are the specific documents that

9   we think may have crossed the line, right, some fraction of

10  the 300 that crossed the line.  Maybe in that scenario, then,

11  you know, they we can say all right,  here's 40 documents,

12  here's 50 documents that reflect crossing the line.

13         These are the documents and maybe as to those we can

14  either do a more fulsome privilege log, option A.  Or option

15  B, if a more fulsome privilege log isn't enough, than maybe

16  there's a narrower group of documents to which the Court can

17  do an in-camera inspection.  Again, I don't want the Court to

18  have to -- the last thing I was is for the Court to have to

19  inspect 300 documents.  But if maybe, again, we shift the

20  burden a little bit and say look -- but what we can't have is

21  this sort of wholesale idea that because Katten took an EUO

22  and sent a letter in connection with an EUO, that every

23  communication with Katten gets wiped out.  That certainly

24  can't be the case.

25         What we're really talking about is how do we narrow

17

1  the scope and define what it is we're looking for.  And I

2  guess what I'm offering is, you know, have them take a look at

3  our privilege log, have them identify, maybe by time, maybe by

4  description, a subset of documents that they believe reflect

5  us crossing the line.

6        We'll offer maybe a more fulsome description than a

7  privilege log and if that's not satisfactory than we have a

8  smaller set that we could ask the Court to conduct an in-

9  camera inspection on.

10       THE COURT:  Okay.  All right.  Then flipping it, why

11 do you need the information from them?

12       MR. HORN:  May I?

13       THE COURT:  From the lawyers.  Yes.

14       MR. HORN:  Very quick chronology.  We asked for

15 these documents well over a year ago.  It took a year for us

16 to get the documents.  Then when we got the documents, they

17 claimed a whole, [indiscernible] privilege.  So all the

18 representations about how they're, you know, assessing to what

19 they think of these privileged documents they, quite frankly,

20 don't mean a thing to us.  My client was waiting for these

21 documents.  Six months after they turned them over

22 mysteriously, after we made the motion to compel, another 150

23 became unprivileged and they said, okay, you can see these.

24 But here --

25       THE COURT:  So you went from 450 privileged to 300?

18

1          MR. HORN:  Yeah.  There's still 500-some-odd

2    documents they refuse to turn over due to privilege.  But here

3    is really the thing that I -- and I'm going to just Mr. Marks

4    and I will diverge on.  It is the normal practice of insurance

5    companies not to use the same litigation counsel as they use

6    for verification counsel.

7          THE COURT:  No.

8          MR. HORN:  So that was just not correct what he said

9    and I know that because we're in this business.  What State

10   Farm has done now is they've basically said uh-uh-uh, you

11   know, Mr. Marks's firm, they have law licenses.  So you're not

12   allowed to get the very documentation that you need.  They

13   have an obligation under the law not to be adversarial with us

14   during verification.  They cannot throw up this, whoa, we're

15   not going to let you know what we were thinking.

16         Another thing, too, that State Farm should consider,

17   should the Court consider precluding them from putting

18   anything in regarding justifiable reliance?  Because if

19   they're not going to tell us what they knew --

20         THE COURT:  Yeah.

21         MR. HORN:  -- when they knew it, then that's another

22   option for this Court.  As much as I understand that as

23   lawyers would chafe at the idea of attorney/client privilege,

24   if that's something that is sacrosanct, it cannot be used as a

25   sword by State Farm and that is exactly what they did here.

1          Mr. Marks and his firm have been involved

2    personally, the very attorneys who have appeared here are the

3    ones who are personally involved since 2013 is the first

4    entry.  More activity in 2015.  There's 38 pages of a

5    privilege log, 38 pages.

6               THE COURT:  Let me ask you've litigated -- you all

7    have litigated these cases.  I agree, but I don't usually see

8    the same attorneys having been involved in the -- earlier in

9    the development of the claims?  Being the ones bringing these

10   RICO and fraud claims.  So just drawing on your experience in

11   other cases, does this issue then come up or do you get the --

12   have you gotten the verifications, the like, even if there was

13   counsel involved?

14              MR. HORN:  First, it's only come up once before with

15   me.

16              THE COURT:  Okay.

17              MR. HORN:  And it was resolved before we got to that

18   stage.

19              THE COURT:  Uh-huh.  How about you, Mr. Bowers?

20              MR. BOWERS:  It depends.  I've been doing this since

21   2011.  I very rarely have seen -- I haven't seen this

22   privilege log but I rarely -- this volume is unusual.

23   Generally, and without going into specifics, there is one

24   particular law firm that represents plaintiff insurance

25   companies and these and also does claim-stage stuff.  From

20

1   that firm, I recently was on a case where we -- similar amount

2   of documents were turned over, millions of pages.  The

3   privilege log was maybe 15 to 25 documents.  There are

4   privilege fights in discussions but to this extent, I haven't

5   -- aside from counsel and aside from State Farm, I haven't

6   seen it.

7           THE COURT:  Was there a decision in that case by the

8   judge?

9           MR. BOWERS:  We didn't challenge the privilege

10  because according to the law, it was pretty --

11          THE COURT:  It was much smaller?

12          MR. BOWERS:  -- it was small.  Well, no, the case

13  was larger but because the log was smaller.

14          THE COURT:  No, no.  The number of privileged

15  documents.

16          MR. BOWERS:  Yeah, and it was resolved between us.

17  It was resolved between the parties, I'll just say that and

18  there was no motion practice.

19          MR. HORN:  And if I may, Your Honor, just so you

20  understand the true landscape of this.  So then what the next

21  stage of the game was we said, okay, you've identified two

22  individuals and we identified a third in your Rule 26

23  disclosure.  We'd like their depositions.  Then the answer was

24  they don't work here anymore and this was, you know,

25  discussions between counsel.

1          I said, well, can you give me the last known and

2     they had said, well, let's find out whether we're going to be

3     representing them and everything else.  And through

4     discussions with counsel, it was -- one of the things that we

5     discussed was, hey, what about a Rule 36(b)(6) witness, that

6     way you can get this information which I was hoping to be able

7     to glean information regarding this representation, et cetera,

8     and everything else.

9          The problem was we didn't get our objections.

10    They're not going to answer anything to do with justifiable

11    reliance so I am literally flying in the blind and the thing

12    that really is bothersome and I know this doesn't -- it isn't

13    a substantive argument, but the thing that really is

14    bothersome to my client is they're asking for everything under

15    the sun and they won't turn over the very information that is

16    critical.  And of all this referencing of one million

17    documents is nonsense.  That's claim files and everything

18    else.  The meat and potatoes, they don't want to turn it over

19    and I suspect they don't want to turn it over because they

20    realize they have critical problems with this case.

21          They're going to have to explain why it is they were

22    paying claims after this litigation started and now they want

23    to get paid their money back.  They're going to have to

24    explain why it is they never raised all of this fraud defense

25    in arbitrations where they were actually fighting over this

22

1    and why res judicata doesn't apply.

2              I need to know what they knew, when they knew it and

3    I know, I can see from the privilege log, this law firm has

4    been involved from jump street.  How it is they think they can

5    tell the defendants after they brought this lawsuit that we're

6    not going to tell you what we knew and when we knew it during

7    the verification process is ludicrous.  And all of this

8    attempts by counsel to say well, we can subdivide and

9    bifurcate everything else.  I wasn't the one who decided to

10   use the same lawyers for litigation and verification and I

11   don't have the burden to decide what it is.  They made that

12   decision.  They opened this door.

13             If they were so worried about the attorney/client

14   privilege, they should have taken steps to protect it and not

15   use it to abuse us and abuse this Court and this lawsuit by

16   saying, yes, we're going to bring a lawsuit but we're not

17   going to give you any of the information you need to defend

18   this case.

19             THE COURT:  So let me just -- so can you just

20   explain a little bit more for the record?  Assume you got some

21   information about what they knew, when they knew it, how do

22   you anticipate that would affect your defense?

23             MR. HORN:  Well, if they -- if their argument is we

24   didn't know about this, therefore, we were voluntarily paying

25   claims.

23

1           THE COURT:  Right.  Right.

2           MR. HORN:  Once it's determined they knew, and we

3    have since 2013, there's entries from 2013.  If you knew in

4    2013, how are you claiming justifiable rise of anything, but

5    what did you know in 2013, '14, '15 and that includes the

6    conversations with your lawyers who were actively taking part

7    in this investigation?

8               Another thing that was represented here that is just

9    such gilding the lily, you know, all it was was a deposition.

10   No, it wasn't.  They did the EUO.  They were the ones that

11   were reviewing all of the verification questions.  They did

12   all of the verification process, all of it.  They were the

13   front guy.  You can't be both.  You can't say uh-uh-uh, got a

14   law license, you don't get this information.  The law is

15   clear.  Court of Appeals in New York, the law is crystal clear

16   that they cannot hide behind that shield.  And putting it in

17   the vernacular, you can't ride two horses with one butt.  You

18   can't be both.  You can't be --

19           THE COURT:  I haven't had that one presented, but --

20           MR. HORN:  -- investigative lawyer -- you know, you

21   can't be both and you can't pretend, oh, no, now I'm wearing

22   my lawyer hat.  And the representation that there's no case

23   law, we cited all the case law.  There's tons of case law that

24   tell you, that put these carriers on notice.  Don't play

25   around with the attorney/client privilege.  Don't put lawyers

1  in positions where they don't need to be.  That's the problem

2  here.

3          So I can submit to this Court without any

4  exaggeration if we don't get the documents requested, we

5  cannot defend this case because we don't have any of the

6  information we need.  The only things they gave us is the

7  things that we could have figured out ourselves.  It'll just

8  be a fight over medicine at the end.  But if I don't know when

9  they knew it and who knew it and that means actually probing

10 it because it's not something that they're just going to

11 volunteer, hey, I knew it.

12         We're going to need to take -- if it's a

13 conversation we're gong to need to speak to both people within

14 that conversation to get who said what to whom to verify it.

15 They've left us completely impotent to defend this case and

16 they've taken the position now -- and it was brilliant

17 lawyering, brilliant lawyering on Mr. Marks' part and another

18 reason I have the utmost respect for him and his firm, to now

19 change the narrative to go I'm the bad guy because I'm asking

20 for the very thing they need to prove their case.

21         THE COURT:  Yes, your reply?

22         MR. MARKS:  The way that the -- there's a lot of

23 throwing around of things there.  There's mixing of ideas,

24 there's sloppy analysis.  And at the end of the day it's going

25 to do great damage to the attorney/client privilege if it's

1    allowed to prevail and so I need to break it into pieces.

2    Otherwise, we've got a mess on our hands here.  And let me

3    break it into pieces, okay.

4            Let's start, first, with this concept of reliance,

5    okay.  When you talk about reliance, absolutely we have to

6    prove reliance.  No question about it.  And in any ordinary

7    case the defendant in a reliance scenario would love to know

8    what did the lawyer communicate with his or her client about

9    what did you know when you knew it, okay.  But that doesn't

10   allow you to break the attorney/client privilege and say what

11   did your lawyer know when you made a decision about something

12   or whether you relied or didn't rely.  This is an ordinary

13   scenario.

14           The place to figure out whether there's reliance

15   isn't to ask what did Katten Muchin know, what did Katten

16   Muchin figure out.  You don't ask the lawyer in a fraud case

17   what it knew about reliance.  You ask the client.  They

18   haven't deposed a single one of our witnesses.  They haven't

19   sat down and looked -- they throw around, oh, it's only two

20   million pages.

21           The decisions in each one of the claims, there is a

22   claim file.  The claim file is where the decisions are made

23   about whether to pay or deny a claim.  That's where you look,

24   okay, and that's where you're going to see.  They haven't

25   spent the time to do it.  They've thrown this up against the

26

1   wall because for reasons we believe that are tactical.  They

2   could take a look at those documents and then sit down and ask

3   the client, ask State Farm what did you know and when did you

4   know it.?  And if we can't answer that question then it's on

5   us.  We've got to prove it with our witnesses, State Farm

6   witnesses, and that's what matters.

7          Now a State Farm witness can't say I relied and

8   can't establish its reliance through it's own witnesses.  Then

9   that's State Farm's problem.  But you don't get to bust the

10  privilege.  You can't claim, oh my god, I can't do it.

11         And what is it really that we're talking about that

12  we haven't -- or he said the documents I can't have.  I've

13  never seen anything like it that they're hiding behind.  We

14  have produced a significant volume of material here.  We've

15  produced the MCIU file.  This is the file that they think is

16  the heart of this thing.  We've produced 91 percent of it,

17  okay.  The file that's this treasure trove, he's got 90 --

18  31,000 pages of that file they've got.  We've asserted the

19  privilege as to 300 pages, 300 documents of which many, many

20  are post litigation documents which means after this lawsuit

21  started.

22         So he says in most cases, he's seen 50, 20.  Many of

23  these are post litigation in this litigation.  Now, he says

24  okay, next, what's the terrible thing that he claims that we

25  did?  We had the same lawyer that took the EUO and sent the

27

1  letter who's representing State Farm in this case, okay.  That

2  happens.  It's happened with other law firms.  But that

3  doesn't wipe out the privilege.  We can represent State Farm

4  doing this, we can represent State Farm that, we can represent

5  State Farm's CEO in a fight with their neighbor over a dog

6  bite.  If you don't -- the privilege analysis, what we

7  represent them in, the number of different matters in which we

8  represent them in, if we're doing them in different things,

9  it's not relevant to whether there is or is not a privilege.

10         Now, there may not be a privilege.  You've got to

11  look at whether there's a privilege in particular

12  circumstances.  And it may be that you look at the privilege

13  in a particular circumstance and it doesn't exist, but you've

14  got to drill down and do the analysis.  Is there a privilege

15  in a particular circumstance?  And it doesn't disappear simply

16  because the lawyer may have represented them in something

17  else.

18         Then he throws around and says State Farm did all of

19  the verification. There is absolutely no support for that

20  whatsoever.  The only thing that they can suggest is that

21  Katten acted as lawyers sometimes act representing a client in

22  the verification process by taking an EUO and sending a

23  letter, and that's what they've done and that's what they've

24  pointed to and that's it.  The burden's on them to come

25  forward and say that there's something else that wipes that

28

1   out.

2           And so you've got to take a -- now, they say we've

3   got all this case law.  Well, there is no case law that says,

4   one, if a lawyer represents you in verification in a case you

5   waive the privilege.  No case law.  There is no case law that

6   says if you're involved in verification, there is no

7   privilege.  No case law.

8           The case law that there is, the case law that they

9   say, the mountains of case law, is basic case law that this

10  Court is familiar with, which I think the Court started with

11  which is if a lawyer does something that's not lawyerly,

12  there's no privilege.  We agree.  That's not a remarkable, you

13  know, profound principal of law, okay.  And there's the word

14  product law which is the activity has to be in anticipation of

15  litigation.

16          But if you take a look at our law, take a look --

17  well, take a look at what we've asserted privilege to and even

18  if -- and if you take a look at the documents, we have

19  asserted a privilege consistent with that.

20          Now, he says I suddenly wait -- I waited a long time

21  for these documents and then I got a -- part of why took time

22  was because we had to do a privilege log and we did send them

23  additional documents, and the reason we did was this.  We knew

24  there was going to be a privilege fight.  So we went back and

25  we said you know what, we're going to be extra, extra careful.

29

1    We're going to apply the very strict rules.  If this doesn't

2    pass the very strict -- we know there's a chance that we may

3    wind up with an in-camera inspection and we don't want to be

4    embarrassed ,as you might imagine.

5           And so we went back and said, you know what, this

6    one I might be embarrassed if the judge were to take a look at

7    this one and so we said, you know what, we're going to send

8    than one over and that's what we did.  And so what you'll see,

9    what we believe is we have a highly scrubbed, carefully

10   prepared privilege assertion.  And so if they want to

11   challenge privilege assertion, get down into the weeds and do

12   your work and don't throw around things like same lawyer did

13   this, same lawyer did that, all verification is waived, I need

14   reliance, there's no way I can prove my case unless I see the

15   privileged communications between the lawyer and the client.

16          Well, if that were the case, that would be the end

17   of privilege, frankly, in every fraud case that depends on

18   reliance.  Of course you'd love to see that stuff.  We can't

19   go there.  That would be unfortunate.  And make no mistake,

20   this is -- this would reek, this is a fundamental change in

21   the law for which there is absolutely no support.

22          THE COURT:  Anything else?

23          MR. HORN:  Just very briefly, just a bit of

24   clarification.  Some of these documents that they did a fine

25   scrub, they're actually transcripts of EUOs that were held

30

1    back on privilege previously.  And as far as something the

2    Court should be aware, when -- these are two distinct periods,

3    verification and -- they continued doing verification.

4              THE COURT:  Right.

5              MR. HORN:  They're with the client even afterwards.

6    That is -- you know, and we can waive the attorney/client flag

7    around all we want but at the end of the day, State Farm

8    should have known better and they can't have it both ways.

9    They can't have the statutory requirement of my clients

10   cooperate with them during the verification process and then

11   bring a litigation against them, use the same lawyers, and now

12   claim privilege, I don't have to tell you anything.

13             THE COURT:  Okay.  On the motions to compel, have

14   you worked out any of this?

15             MR. MARKS:  I think we have, Judge.

16             THE COURT:  Okay.

17             MR. MARKS:  I think the list is shorter.

18             THE COURT:  Okay.

19             MR. MARKS:  I don't know how -- I mean I'm not sure

20   how much time we have to argue but why don't I tell you what

21   the list is at least?

22             THE COURT:  Okay.  We have about 20, 25 minutes.  So

23   this is what's left or what's been eliminated?

24             MR. MARKS:  I can give you what's left.  That's the

25   list I have.

31

```
1              THE COURT:  Okay.

2              MR. MARKS:  Is that -- would that be helpful?

3              THE COURT:  Yeah.

4              MR. MARKS:  And then you can decide what you want to

5   argue.  So there's been a bunch of letters but I think, I

6   think this is what I understand to be left about which there

7   is disagreement.  I think a couple of these things we may be

8   able to address quickly now.

9              Item 1 is 21st Century.  We just need simple

10  interrogatory answer that says these are 21st Century's bank

11  accounts and we need it verified.  There's been some back and

12  forth, look at the documents, we told you, there's this,

13  there's that.  I think it just could be simply summed up to

14  say these are the bank accounts, I verify it, I got no others.

15  That's the simplest way and then we don't have to file e-mails

16  back and forth to each other and that's one.

17             The next is Mr. Alishayev.  We need simply a sworn

18  e-mail interrogatory response from him in which he says these

19  are my e-mails addresses, these are my phone numbers.  During

20  his deposition he was able to identify one e-mail but he was

21  confused about whether he used others or not or which e-mails

22  he used.  There are e-mails that may be his or may be other

23  people's and we need to just know which ones are his and which

24  ones did he use and which phone numbers are his and which ones

25  are -- he didn't know, in his deposition, but that's something
```

1   he could probably figure out.  Again, just this one response

2   saying these are my e-mail addresses, these are my phone

3   numbers.  Swear it.

4            The next category is we need personal bank account

5   records of Alishayev and Ajudua and personal tax returns of

6   Alishayev and Ajudua.  Now those are --

7            THE COURT:  Why do you need those?

8            MR. MARKS:  Well, these are two categories I suspect

9   we're probably going to have a fight about.  But let me tell

10  you what our theory and view is on the personal financial

11  records of these two individuals, and the theory is a little

12  bit different as to each, Your Honor.  And I'll try to be

13  brief because I know we're running short on time.

14           I'll begin with the amended complaint.  It is State

15  Farm's theory that there are a number of significant financial

16  -- that the scheme works through financial, elaborate

17  financial transactions and there are two parts of the scheme

18  that are important.  One, the secret ownership and control of

19  21st Century.  It's not just owned by Alishayev, it's owned by

20  The Management Group which is four individuals.

21           THE COURT:  So now this is, sorry, I'm blanking.

22  What's the doctor cases?

23           MALE:  Malela [Ph.].

24           THE COURT:  Thank you, Malela.  So this is almost a

25  Malela-type argument?

1          MR. MARKS:  It's not quite Malela, Your Honor,

2  because --

3          THE COURT:  Okay.

4          MR. MARKS:  -- it's not illegal for lay people to

5  own a pharmacy.

6          THE COURT:  But the structure that we keep seeing in

7  those cases?

8          MR. MARKS:  Yeah.

9          THE COURT:  Okay.  All right.

10          MR. MARKS:  We've got a complex structure here.

11          THE COURT:  Okay.

12          MR. MARKS:  And part of how we believe that control

13  was exercised was through money moving in and out of what we

14  label as -- what we call in the complaint shell companies, I'm

15  sure the defendants will call them something else.  We call

16  them shell companies.

17          THE COURT:  Yeah.

18          MR. MARKS:  And some of these shell companies are

19  now defendant.

20          THE COURT:  Uh-huh.

21          MR. MARKS:  And we've got, Your Honor, literally

22  millions of dollars moving back and forth, going back and

23  forth, in and out, okay.

24          The other piece of it is we now have really at the

25  Court's suggestion merging, we've now explicitly alleged

34

1  kickbacks, okay.

2           THE COURT:  I did not urge you.  I said you had not

3  done it so your connections were weak on looking for other

4  information but, okay, yes, the kickbacks.  Yeah.

5           MR. MARKS:  So we have financial arrangements and I

6  will tell you --

7           THE COURT:  Right.

8           MR. MARKS:  -- that, you know, they will take the

9  position that our evidence isn't good.  Our evidence has

10  gotten really, really good on the kickback story and we have

11  some very blatant instances of kickback payments.  And, in

12  fact, one of the startling things about Mr. Alishayev's

13  deposition was when asked is X a kickback payment, right, or

14  did so-and-so make a kickback payment so you can get

15  prescriptions, his answer wasn't absolutely not, which is what

16  you'd think a defendant would say in that circumstance.  It

17  was I don't know, sort of an interesting answer particularly

18  in a case like this.

19           But the ways in which these were affected was

20  through the -- part of it was the movement of money and the

21  money moves, it's passing back and forth through these shell

22  companies and we see it.  So, for example, there's a company

23  that's owned by Alishayev's father, okay, called Personal Tech

24  and the money's going back and forth and it's passing through

25  these to pay the kickbacks and also to get to marketers.  It's

35

1  passing back and forth through the marketers.

2          So you got the money, nobody's paying it directly.

3  It's moving, right.  And so our point is is you've got a lot

4  of money that's moving around, okay.  So that's point one

5  that's important.  And part of these entities is to hide this

6  movement of money.

7          THE COURT:  And you think -- you are saying both

8  Alishayev and Ajudua use their personal bank accounts for some

9  of these movements of the money tied to either version of

10 these schemes, the kickbacks, the group ownership which, you

11 know, may all be tied together anyway.  Is that what you

12 believe?

13         MR. MARKS:  We do and we do for a couple of

14 important reasons.  One of the things that Alishayev have

15 testified to, which is sort of important, is that he basically

16 said, look, he has other entities that he owns, right.

17         THE COURT:  Right.

18         MR. MARKS:  But he admitted, in his deposition,

19 these other entities that I own, they didn't do anything.

20 They didn't have employees, they didn't do any business, I

21 just owned them.  And what do they do?.  He didn't know?  In

22 other words, the only business or occupation he had when he

23 operated 21st Century was 21st Century.

24         THE COURT:  Those are my interns.  You can come on

25 up.  Sit up here.

36

1          MR. MARKS:  In other words, he more or less

2    acknowledged that these were companies through which he was

3    passing money for whatever purpose, okay.  So that's

4    important.  The other thing he sort of acknowledged in his

5    deposition are that the general ledgers that we --

6          THE COURT:  Right.  That they're not accurate.

7          MR. MARKS:  That they're not accurate.

8          THE COURT:  Okay.

9          MR. MARKS:  So we can't rely on the corporate

10   documents of 21st Century.  So we've got money moving and that

11   there are transactions that are going to him that are

12   characterized as business events, some of which he said were

13   personal, that he got for personal purposes.  So we've got

14   money moving around, we've got this money moving around as

15   part of a scheme, and we've got these entities that don't do

16   anything, that he admits he's sort of moving money through and

17   so you connect all that together and keep in mind that

18   Alishayev is now a named member of an association of fact,

19   RICO Enterprise.

20         THE COURT:  Okay.  So what's the information about

21   Ajudua's personal accounts?

22         MR. MARKS:  Sure.

23         THE COURT:  Because I'm looking at the letter --

24         MR. MARKS:  Yes.

25         THE COURT:  -- on the docket at 188 which --

37

1          MR. MARKS:  Yes.

2          THE COURT:  -- includes a lot of what you just said

3    but what about Ajudua?

4          MR. MARKS:  Yes.

5          THE COURT:  He has a statement about not really

6    knowing where his money's going --

7          MR. MARKS:  Yes.

8          THE COURT:  -- but what about the personal accounts?

9          MR. MARKS:  Yes.  So Ajudua, Your Honor is

10   absolutely correct.  The analysis under Ajudua is different

11   and the reason the analysis, Ajudua is a doctor.  So one of

12   the ways in which we think prescriptions were generated was

13   because people controlled clinics, they controlled locations

14   and they made the prescriptions happen out of that location.

15   And we believe that happened at the clinics that Ajudua

16   controlled.  He controlled it probably four where these --

17   didn't control, he worked at four where these happened, okay.

18   He's got four clinics.

19          And one of the things that was striking about

20   Ajudua's testimony is that of these four professional -- now,

21   these are Melela, this is the Melela situation.  There are

22   four professional corporations that he owned on paper.

23          When he -- he said two important things.  He said

24   there are prescriptions with my name on them that I didn't

25   sign, okay.  So somebody's signing my prescriptions and I

1    think, he's speculated --

2                THE COURT:   The officer person.

3                MR. MARKS:   The office, meaning the lay person who's

4    running the clinic, right, and enormous amounts of money.   He

5    was confronted with probably over seven figures in money

6    that's moving out of his professional corporations that he

7    said I've never seen that before, I don't know about that, I

8    didn't authorize it.   He looked genuinely shocked at the

9    amount of money that was going out of his professional

10   corporations without his knowledge.

11               He also said he had not actually seen the corporate

12   tax returns of his own professional corporations other than

13   the first year and had not seen the general ledgers of his

14   professional corporations before.   So we don't know how much

15   money he actually got, how much money went to him and that's

16   important because it shows really the extent to which he

17   actually controlled, he actually was in -- because that

18   relationship between how much he gets and how much other gets

19   is critical to this.

20               THE COURT:   Do you have money going to him?

21               MR. MARKS:   We have some money going to him but we

22   don't know -- we don't know, ultimately, how much he

23   ultimately gets because he doesn't know.   Frankly he has no

24   idea.   He kind of threw up his hands, as I said, and he was

25   sort of shocked and surprised at how little he is actually --

39

1   how much was going to other sources and --

2          THE COURT:  All right.  So you want their -- each of

3   their bank records.  What about the tax records?  You were

4   talking about the tax records, their personal and their duel

5   tax records?

6          MR. MARKS:  Yes.  The tax records, the analysis,

7   Your Honor, is similar and it's for the same reasons in part

8   because, number one, we cannot rely on any of the corporate

9   documents that we've seen either from 21st Century or from the

10  clinics.  We can't rely on their corporate tax returns or

11  their general ledgers because of what we basically heard in

12  the testimony.  That's important.

13         The other thing is is that we want to see,

14  essentially, now -- you know, what they declared, what they

15  claimed that they received.  And there is, and particularly in

16  addition the case of Alishayev a tax component to some of what

17  he was up to.  So, for example, one of the elements of this

18  scheme is that some of these shell companies that are, we call

19  shell companies, they're supposedly disconnected from each

20  other, are all making similar payments at the same time.

21  Alishayev testified he didn't know why that was happening.

22  Maybe it's a coincidence.

23         THE COURT:  Similar in what way?  The same amount of

24  money that's going out to --

25         MR. MARKS:  Two of the same people about --

1           THE COURT:  Okay.

2           MR. MARKS:  -- the same time.

3           THE COURT:  Okay.

4           MR. MARKS:  Okay.  And on the corporate tax returns

5    some of these are being characterized as business expenses and

6    during his testimony he claimed some of them were intended to

7    be compensation for him, okay.

8           Now if they were claimed as compensation how did he

9    treat them on his tax returns?  Were they compensation, were

10   they business expenses, what really are the nature of these

11   payments that we believe are, in fact, in furtherance of the

12   scheme and, in fact, frankly, what are the nature -- how is he

13   characterizing the payments that he's making to all of these

14   various, what we believe are, shell companies.  And that, of

15   course, is important to show what these transactions are and

16   how they're, in fact, furthering the scheme.

17          THE COURT:  Okay.  So what else -- all right.  So we

18   have -- you want the 21st Century interrogatories of the bank

19   accounts, you want Alishayev's sworn response about his e-

20   mail, you want the bank records for Alishayev, Ajudua and

21   their tax records.  What else is open?

22          MR. MARKS:  There's another general category and it

23   encompasses a variety of different requests, but it's what

24   I'll call Alishayev's other businesses, right.  So we seek

25   records related to his other businesses.  And the Court had

41

1  previously ruled under the original complaint that if it was a

2  different business, off limits, and that certainly made sense

3  and we understand that ruling and that ruling made sense at

4  the time.  But particularly given Alishayev's testimony that

5  he really didn't have any other businesses, that during the

6  time that he was operating 21st Century all these other

7  entities, they didn't have employees, they didn't do any

8  business.  In some instances he sort of really didn't even

9  remember them or know what they were doing.

10        There really is no other business or occupation.

11  That any other entity that he is operating are, in fact, part

12  -- there's money moving in and out of them from 21st Century.

13  We now know that.  We didn't really appreciate that before.

14  They are a part of what 21st Century is doing and what it's up

15  to.  And, additionally, now in the amended complaint a number

16  of these other entities are now identified by name in the

17  amended complaint as elements of the scheme and how the

18  schemes operated.  And so for that reason, we think they

19  become fair game.

20        THE COURT:  Is that the same argument about their --

21  this is your letter at 188, the land and property?

22        MR. MARKS:  Yeah.  Well, the land and property is

23  the same argument but a little -- there's also a little bit of

24  a wrinkle on the -- one additional sort of observation about

25  the land and property and that is, well, couple of wrinkles.

42

1    One, keep in mind that one of the ways in which control over

2    locations is exercised is by having the doctor who operates

3    that pay rent, okay.

4              THE COURT:  That's a more traditional scheme that

5    you and your -- those who bring these kinds of cases talk

6    about, right?

7              MR. MARKS:  The other thing is that we have, again,

8    all these supposedly disconnected entities that are supposedly

9    not related to each other.  They're all also paying money in

10   real estate transactions.  Again, same time to the same

11   people.  They're supposedly disconnected and during his

12   testimony Alishayev could identify what some of them were.  He

13   couldn't identify what others of them were and that's

14   important.

15             THE COURT:  That is the ones that are on the second

16   page of your letter at 188?

17             MR. MARKS:  Yes.

18             THE COURT: NC Systems, [indiscernible].

19             MR. MARKS:  It's where we mention -- I think, in our

20   letter, we mentioned DeKalb Avenue Realty?

21             THE COURT:  Yeah, uh-huh.

22             MR. MARKS:  Yeah, it's those.  So those city

23   residential properties, Florida Gardens Owner's Corp, in those

24   instance -- for, example, DeKalb Avenue Realty, it gets

25   $48,000.  It gets paid by 21st Century, it gets paid by

43

1   Express Billing, it gets paid by --

2           THE COURT:  Forty-right thousand dollars goes out at

3   about the same time?

4           MR. MARKS:  About the same time from four different

5   entities that are --

6           THE COURT:  Your colleagues.  Did your colleague

7   want to say something?

8           MR. COOK:  Yeah, they're monthly payments.

9           MR. MARKS:  Oh, I'm sorry.  They're monthly payments

10  that add up to $48,000 and they're from four, separate

11  entities.

12          THE COURT:  Okay.  Right.

13          MR. MARKS:  And one of which is Personal Tech, an

14  entity that Alishayev --

15          THE COURT:  That's the relative?

16          MR. MARKS:  Yes.  That, by the way, Alishayev

17  testifies that was my father.  Anything it did I had nothing

18  to do with, I don't know anything about it.  So the fact that

19  it's making payments that seemed to be coordinated with

20  entities that he is involved with is potentially significant

21  because it is, as we allege, a member of this scheme operating

22  in concert to the existence of common action is relevant, Your

23  Honor.

24          THE COURT:  Okay.  What else?  Just what else is

25  remaining?

44

1    MR. MARKS:  I think the only other thing, Your

2  Honor, that I've missed is cash transactions.  So -- and,

3  again, the response to this is not we don't have any, there

4  aren't any instances in which we converted funds to cash,

5  okay.  It's that you can't have them which is sort of an

6  interesting response.

7    But what we have, Your Honor, is cash is obviously a

8  way in which kickbacks get paid.  That is our theory, but

9  beyond our theory, we actually have a specific instance, at

10  least one, in which a marketer named Tommy Novakov at the time

11  it was working for 21st Century receiving payments from a

12  bunch of these entities, converted about $200,000 to cash.

13  When asked at his deposition, Alishayev was asked was this

14  $200,000 that Tommy Novakov used to pay kickbacks?  Answer

15  wasn't absolutely not, no way.  It was I don't know, okay.

16  And then you have, at the same time, Khaim and Begiyev, two

17  new defendants.  They're routinely converting money to cash to

18  an entity called J Payroll Services.

19    So, again, if they've got instances where they're

20  converting to cash, great, turn them over.  And if they're

21  not, which is what you'd expect from a legitimate business,

22  it's not -- there's no reason for it to be conducting business

23  in cash, then, you know, let's see.

24    THE COURT:  Okay.  So then for defense, again, just

25  tell me your responses to those but I have these materials.

45

1  What is still outstanding on your end?  I mean if it's

2  everything and you want to just tell me what you resolved,

3  that's fine.

4          MR. HORN:  What we need from them?

5          THE COURT:  Yeah.

6          MR. HORN:  A lot.

7          THE COURT:  Are you going to respond to them or --

8  but if you've already said it in your letter, I mean really I

9  was just asking a question to know if anything had improved in

10 the last couple of days in terms of what remained outstanding.

11 So, you know, if you've already put it in the letters, I don't

12 need -- we don't need to go over it.

13         MR. HORN:  Okay.

14         THE COURT:  I just want to take out things that

15 you've dealt with.

16         MR. HORN:  There's situations that are going to come

17 up.  Like, for instance, the issue with counsel have discussed

18 how it's going to work with the depositions.

19         THE COURT:  Uh-huh.

20         MR. HORN:  The reserved the right to object to the

21 calling of the actual people who were involved in the

22 verification.  If the -- and I've said, look, if the Rule 36

23 witness gives me what I need, you know, then I wouldn't need

24 any witnesses.  I, of course, will leave that deposition and

25 buy a lottery ticket to do that.  But so there's still

1  depositions that we -- and all of this is dependent really to

2  our motion to compel and then that has, obviously, directly

3  impacts the motion to disqualify.

4        THE COURT:  Uh-huh.

5        MR. HORN:  So we're kind of stuck -- and I say we, I

6  think both sides -- as far as our discovery demands of them,

7  we're kind of stuck in limbo until we receive some guidance

8  because --

9        THE COURT:  Okay.

10        MR. HORN:  -- when we received -- you know, they're

11  going to object.  One of the things that Mr. Marks had said

12  was, you know, when we were talking about privilege and he

13  also reiterated it now, they've objected to us asking the

14  State Farm witnesses anything that they knew based on

15  privilege.  So really they're going to say, well, you know,

16  [indiscernible] and I can't tell you.  That's, you know,

17  attorney/client conversations with the lawyer.

18        THE COURT:  Is that not a hearsay?  Is that not

19  true?

20        MR. HORN:  It's in their objections.

21        MR. MARKS:  That's just -- that's not -- that is not

22  what we intend to do and that is not what our objections

23  state.  They are certainly -- when they bring our witness in

24  they're certainly able to ask our witnesses, you know, what

25  did you rely on, what did you make a decision to pay or deny

47

1  this claim on and the witnesses are able to answer that

2  question.  What they're not allowed to do is say, you know,

3  did you -- you know, what legal -- did you have a -- if there

4  are legal communications with their attorney.

5          THE COURT:  I think there's a different question,

6  probably in between, which is if the attorney communicated

7  information to the State Farm person and the question is what

8  did you know, then it doesn't matter if it's a fact and it

9  came from the lawyer unless somehow you're going to say that

10  that's something that was part of some attorney work product

11  and they needed to consult with the State Farm person.

12          But, you know, obviously the drum that defendants

13  are beating is that State Farm knew a lot and still decided to

14  pay.  And so it's unreasonable for you to be making these

15  claims, you know, under the rubric of fraud and now RICO.

16          MR. MARKS:  And, Your Honor --

17          THE COURT:  Unreasonable, unsupportable, et cetera,

18  et cetera.

19          MR. MARK:  And, Your Honor, and that will certainly

20  be resolved on a question-by-question basis.  You're

21  absolutely right.  So under certain circumstances if there is

22  -- we're not -- we're only going to claim a privilege as to

23  things that meet the appropriate definition of privilege but

24  that does not mean that we have to establish reliance, Judge,

25  if we're going to win our case.  So we are going to tender

1  witnesses who are in a position to show that we rely and we're

2  going to allow inquiry sufficient for them to be able to

3  address that question.

4       THE COURT:  Okay.

5       MR. MARKS:  If we can't, that's on us.  And if they

6  ask appropriate questions, they're going to get answers, and

7  if they don't then that's -- then they can bring it to the

8  Court's attention on question --

9       THE COURT:  Okay.  All right.  I got it.

10       MR. MARKS:  -- just as we --

11       THE COURT:  You know, I think that this is -- in

12  some ways this is going to have to move ahead and test these

13  issues and if you're not getting any answers then you can

14  raise the issue and we'll see what should happen in these

15  depositions.

16       Okay.  So basically all of your issues are still

17  open as described?  Nothing's improved?  Okay.  Oh, well.

18       All right.  Let's talk about scheduling.  I mean

19  this is a 2017 case and while the RICO claims are new, we've

20  been, you know, going on and on and on about this.  So I think

21  the schedule as proposed in yesterday's letter is not

22  reasonable.  I mean 2021, that's like so far ahead.  You know

23  what you need to do.  You basically identified the landscape.

24  I guess what's not clear to me is how much you think each

25  side, although I guess it's really more for the plaintiffs,

49

1   how much you think the records are in the custody or control

2   of the individuals and entities that you've identified or if

3   you think these are going to be third party or non-party

4   subpoenas to the banks, to the accountants, to the, I don't

5   know, the real estate brokers.  I mean I don't know, you know.

6          They're moving out to Florida at this point, right,

7   so, you know, there could be out-of-state discovery which can

8   take longer.  But it seems like you have a general idea of the

9   landscape here, so you've had a lot of time and, you know,

10  it's like the last order on this.  You should've been doing

11  stuff for the last several months.  So this schedule that goes

12  to 2021 is not reasonable.  So why can this not, you know,

13  wrap up, discovery-wise in the next six or seven months?  I

14  mean it's just -- come on.  We've been at it for a really long

15  time.  Yes?

16         MR. MARKS:  So a few things. So, number one, our

17  ability to address sort of these issues of who owned and

18  controlled 21st Century and the kickbacks and financial

19  arrangements really only began once we filed the amended

20  complaints.

21         THE COURT:  It's not true.  I mean we're not going

22  to rehash this, but it's not correct.  So you've had, you

23  know, literally years on general discovery, you've had the

24  opportunity to push that forward earlier.  So that's not

25  something that I accept as a reason why this case is not

50

1  further along.  But given that you have a sense of the

2  landscape why is six or seven months not enough time to deal

3  with this?

4          MR. MARKS:  Sure.  Okay.

5          THE COURT:  You know, with the question how much of

6  this is coming from parties either outside of the realm of

7  what's been described or, seriously, there is mention in the

8  Florida real estate so are we talking about out-of-state

9  discovery which that can get complicated, et cetera.  Go head.

10          MR. MARKS:  So, all right, so, Your Honor, so here's

11  what we anticipate and here's are the reasons why we think we

12  need the time that we've proposed.  One, we do -- the time is

13  basically built around the idea that we're going to have to

14  take -- first of all, we've had depositions of the parties,

15  themselves, okay.  There are 14 parties.  Now I understand

16  that some of these parties may be sort of controlled by one

17  person, right, so [indiscernible].

18          THE COURT:  Right.

19          MR. MARKS:  But still we have quite a number of

20  parties.  The complaint itself identifies quite a few

21  additional non-parties, the marketers and consultants.

22          THE COURT:  I mean look at this, two- or three-hour

23  depositions.  I mean how did you get into this, what doctors

24  did you do, who told you to do this, how did they pay you.

25  I'm not saying it's not a lot of work.  I'm saying it's been

1   going on for a long time.

2          MR. MARKS:  Well, I agree, Your Honor.  I'm just

3   telling you that there are going to be -- there are going to

4   be a significant number of depositions of parties and non-

5   parties.  There's going to be a significant -- there's going

6   to be document discovery that we're going to need from parties

7   and non-parties.

8          I will tell you that experience suggests that it

9   takes time to get documents from parties and non-parties

10  despite their best intentions to respond promptly and quickly

11  because I suspect we're going to have some fights that end us

12  back here that will take time.  You know, if history's any

13  indication, I mean it took almost a year to resolve some

14  discovery and, again, we're not suggesting that long.  It took

15  almost a year to resolve some document discovery issues here

16  as well and then I will tell you that we've --

17         THE COURT:  Well, I mean the caveat -- stop asking

18  for things you're not going to get.  I mean --

19         MR. MARKS:  No, no, no.

20         THE COURT:  -- move it along.

21         MR. MARKS:  Yeah, no, and we -- judge, we've been --

22  and I will tell you since --

23         THE COURT:  Uh-huh.

24         MR. MARKS:  -- since the Court ruled on the motion

25  for leave to amend we have been moving full steam ahead.

52

1          THE COURT:  Okay.

2          MALE:  We've taken a lot of depositions.  We and

3   defendants' law firm have been getting along well.  We are

4   moving at great speed, okay.  But it's very -- it's been very,

5   very time-consuming and we're moving at great speed.  And I

6   will tell you that it's our intention to move forward at a

7   high speed but there is a lot of depositions.  There are a lot

8   of parties and non-parties to documents.

9          And I'll tell you this, Your Honor, the other piece

10   of this is when you figure into the schedule, and I know this

11   -- you know, this is sort of extraneous, but you've got --

12   part of this window is, I feel almost ridiculous saying this,

13   but I got to put it out there, we're going into December where

14   we lose time.

15          THE COURT:  Yeah, but we lose the summer at other

16   times.

17          MR. MARKS:  I know.

18          THE COURT:  I know.  I mean look there's a rhythm in

19   New York, right.  Summer ends and we have the Jewish holidays

20   then we have Thanksgiving then we have Christmas and then

21   everybody works really hard then we go to Easter and Passover

22   in school and then summer's here again, right?  I mean just

23   what it is.

24          MR. MARKS:  Let me put out one other piece that's

25   sort of relevant when we think about the schedule and that is

53

1  -- and, again, we are all going full-speed ahead.  I have no

2  idea whether there is even a potential for settlement.  But I

3  will tell you that the tighter, the schedule the more

4  difficult it becomes to settle the case and here's why, and

5  there are reasons why.

6          One is sort of just the practical point of we are

7  all so busy trying to move this case along and not attend,

8  really, to anything else we're working on in a short amount of

9  time.  So that's number one.  Number two, the more that State

10 Farm incurs in costs, I'm sure this is true of defendants as

11 well, the higher the dollar amount goes and the harder it is

12 for us to come up with numbers that makes sense.  That's a

13 factor.  And I'll tell you that in our experience the case has

14 been getting stronger.  I'm sure defendants will disagree. It

15 makes it harder.  So that, too, is a factor as we think about

16 -- as we think about the schedule and that is relevant to us

17 as well as we think about the schedule.

18         THE COURT:  All right.  All right.  So let's talk --

19 well, let me hear from you.  You want to move it along?

20         MR. HORN:  So, Your Honor, we --

21         THE COURT:  Do you want to spend through 2021 on

22 this?

23         MR. HORN:  -- Your Honor, we propose end of paper --

24 of fact discovery in March, March 2nd.  That's what we

25 discussed with the plaintiffs, that is the disagreement that

54

1    we had.

2            THE COURT:  Uh-huh.

3            MR. HORN:  And then similar dates.  You know, a

4    month for initial expert reports, a couple months for the

5    rebuttals and, essentially, discovery conclusion and it would

6    -- discovery would be completely concluded by mid-August and

7    then pre-motion letters to Judge Brodie around a month from

8    then.  That's what we anticipate.

9            I think that some of what counsel says is

10   inaccurate.  I think that a faster schedule, my experience as

11   a litigator in these cases and others, tends to encourage

12   settlement whether it's because certain parties -- they can't

13   sit on documents that they don't want the other side to get

14   whether that's plaintiffs or defendants.  They have to make

15   the decision now and they make the decision to settle.

16           Costs, with a faster schedule --

17           THE COURT:  Yeah, I get it.

18           MR. HORN:  -- costs don't drive up as quickly.

19           THE COURT:  Okay.

20           MR. HORN:  Whereas, if we allow plaintiffs to

21   meander through half of the bank accounts in New York for a

22   year, costs are going to go up.  So, for that, I am inclined

23   to agree with the Court.  Something -- give us five months,

24   maybe six months, see where we are then if there is some

25   compelling need for an extension the Court can make a decision

55

1   at that time.  Whether it's because of there's intransigent

2   third parties, litigants who don't want to turn everything

3   over, fights such as about privilege or about the scope of

4   discovery.  If that makes it necessary, we can revisit it at

5   that time.

6          But until then I think a faster, tighter deadline

7   would compel everybody to move more quickly and it would also

8   compel third parties, should they be subpoenaed, to respond

9   within the deadline and will give plaintiffs some rhetorical

10  weaponry to pressure third parties to respond and not sit on

11  things for six months.

12         THE COURT:  All right.  Look I'm going to give you

13  the schedule which is pretty close to what you're proposing.

14  This case was filed in October of 2017.  You know, I

15  understand that RICO has arguably expanded this but that's

16  been a question since -- really all along.  It was a strategic

17  decision not to bring it as RICO and we've certainly been

18  talking about RICO for many, many, many months.  So if that's

19  the reason why then it doesn't seem adequate that this has not

20  moved further on.

21         I appreciate that it's taking a lot of work but, I

22  mean, it's a big case.  It's at least what the defendant's,

23  sorry, what the plaintiff's saying about the defendant is this

24  is a, you know, positively, ultimately contained in a bubble

25  system but it has many small pieces that you want to

56

1    investigate.

2              So the schedule is as follows:  Fact discovery

3    closes March 31st.  That same day expert disclosures from

4    whoever's moving on the issue should be made.  Initial expert

5    report is due April 30th.  The rebuttal report is due June

6    30th.  It really should be the end of discovery.  If it turns

7    out that you need to depose the experts, you could, you know,

8    talk to me about that but I'm not sure how that's going to go

9    in this case.  Are you going to do the expert discovery -- you

10   know, one report is produced and then do the deposition and

11   then do the next report?  I don't know.  So the end of

12   discovery, June 30th, the letter to Judge Brody, July 31st and

13   July pretrial order, August 31st.  Now if you need the time to

14   depose the rebuttal expert, you know, after June 30th, you can

15   do that.  I don't know whether that would affect anything that

16   has to do with the pre-motion conference letter.

17             All right.  So I have all these motions.  It may be

18   that I ask you for, you know, the retainer agreement, if there

19   is one, or a sample of some of these documents so I can see

20   what they are with regard to the privilege issue.  I don't

21   know.  But we'll rule on these emotions.

22             So settlement.  I mean I do get it that if you're

23   focusing the material, you know, that can be hard to focus on

24   settlement.  On the other hand, you, both, all have litigated

25   many of these cases.  The agreement seemed relatively similar,

1   at least the ones I've seen, and it's really about numbers and

2   then, you know, maybe there's some difference about now do you

3   continue in the business, what's your position with regard to

4   that, but it's not really that different.  It's usually about

5   dollars.

6           So, you know, maybe you need to do some more this

7   discovery to get a better handle on how strong or weak,

8   whichever way you want to go, on a particular issue and

9   particular exposure for any given defendant.  Now there are

10  more defendants they may fee differently about this.  Some of

11  them are new.  I don't know how much, you know, to the extend,

12  in quotes, they are shell companies.  They may not be a

13  [indiscernible] there.  Nobody gives a hoot about it.

14          But, anyway, I mean you get a better overview and

15  you can make a decision about whether you want to have

16  settlement discussions.  If you're close to settling then, you

17  know, that might be a reason to extend this.  Certainly I

18  acknowledge things can happen and that might meet the good-

19  cause standard but, you know, this is a schedule of two and-a-

20  half years on a case.  It's enough.  Yes?

21          MR. HORN:  The only issue we have is, from my point

22  of view, we're kind of waiting to know what we can get before

23  we drive forward.  So, you know, I feel like we're kind of --

24  we're wearing handcuffs because we don't know and, ultimately,

25  the issue then leads directly to the disqualification issue.

58

1          THE COURT:  Uh-huh.

2          MR. HORN:  Because we may want their depositions.

3          THE COURT:  Yeah.  I don't know about that one but

4     we'll see.  I don't know.

5          MR. HORN:  You know, because it's 500 documents I

6     haven't seen and I know they were involved, for six years, on

7     an investigation long before it ever became a litigation.  So

8     it becomes a real problem.

9          THE COURT:  Uh-huh.  Okay.  Anything else?

10         MR. MARKS:  Should we anticipate, should we set

11    another status at some point, Your Honor --

12         THE COURT:  I mean we'll do it.

13         MR. MARKS:  -- just to check in at some point

14    because, look, I suspect -- I have a feeling we'll go with the

15    Court's schedule.  That will require one of the things that

16    Mr. Bowers said in our conference was that -- I said are we

17    going to have a lot of objections to our discovery?  He said I

18    intend to promptly and quickly comply and I look forward to

19    that and if that's the case then all things will be smooth

20    sailing.  If we don't get prompt and quick compliance then,

21    you know, we'll have to ask the Court's help to keep

22    defendants to the schedule.  So does it make sense to set a

23    status or --

24         THE COURT:  Well, we'll -- let me decide these

25    motions and see what the schedule looks like and go from

59

1    there.

2              MR. MARKS:  All right.  We'll leave it to the Court

3    then.

4              THE COURT:  Yeah.  I mean, look, in general I've

5    given -- when you've had these motions you've put in a lot of

6    briefing.  The quicker way to do this is to raise these issues

7    with really simple letters.  Come in here and just tell me

8    about it or have telephone conferences, you know, if you think

9    that the briefing of the discovery issues is taking too much

10   time, especially if you're on a more expedited schedule.

11             So, all right.  Anything else?  You know, the

12   settlement in general I would offer, you know, we could have a

13   settlement conference, you could use the court mediation

14   service.  I just know that you all have been at this as long a

15   the privilege log -- that was funny when you said 2011 because

16   I became magistrate judge in 2012 and I think my first case

17   was -- I feel like yep, we've been doing this a long time.

18             UNIDENTIFIED SPEAKER:  Yeah.

19             THE COURT:  So like if you think there's something

20   that could help move settlement forward, you know, let me

21   know.  Sorry.  The last question before we go.  What do you

22   want to do?  Do you want to still proceed with the motion to

23   dismiss?  Will turn into a motion for summary judgment.

24             MR. HORN:  At this time, yes.  If I change my mind

25   I'll let counsel know and the Court know immediately.

60

1          THE COURT:  Okay.

2          MR. HORN:  I do want to speak with my client before

3   I make that kind of decision.

4          THE COURT:  Okay.  All right.  Thank you.

5          MR. HORN:  Thank you, Your Honor.

6          THE COURT:  All right.  Take care.

7   (Proceedings ended at 10:50 a.m.)

8                    *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

61

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6              Shari Riemer, CET-805

7  Dated:  October 9, 2019